UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TOUCHSTONE RECOVERY HOMES LLC,
a Michigan corporation,

        Plaintiff,

                                    Case No.
                                    Hon.

        Vs.

CITY OF RIVERVIEW,
a Michigan municipal corporation,

        Defendant.

_____/

DAGHER GOODMAN DAGHER, PLLC
By:    Morris H. Goodman (P14166)
Attorney for Plaintiff
Dearborn, MI 48126-3148
(313) 846-1900

_____/

## COMPLAINT

    NOW COMES Plaintiff, TOUCHSTONE RECOVERY HOMES LLC, a Michigan corporation (TRH), by and through its attorney, MORRIS H. GOODMAN, and for its Complaint, states as follows:

### JURISDICTION AND VENUE

    1.      Plaintiff, TOUCHSTONE RECOVERY HOMES (TRH), is a Michigan Limited Liability Company with Registered Office address P.O. Box 1793, Ann Arbor, MI 48106.

    2.      Defendant, CITY OF RIVERVIEW is a municipal corporation located in the State of Michigan.

1

24.     The January 27, 2012 deadline imposed by Defendant for compliance with municipal licensing rules and a $500 possible if no action is taken  s a clear and present threat to the primacy of the Fair Housing Act as it applies here.

## VIOLATION OF FEDERAL FAIR HOUSING ACT
## AND AMERICANS WITH DISABILITIES ACT

25.     Plaintiff adopts and incorporates by reference paragraphs 1 through 24 above as though stated fully herein.

26.     The Federal Fair Housing Act (FFHA) prohibits discrimination against a protected class of people in the sale, rental or to otherwise make unavailable or deny a dwelling to any buyer or renter because of a handicap.

27.     The residents of TRH are considered a protected class based on their familial status and handicap.

28.     Under the FFHA, there is no reason to examine further the zoning of the dwelling occupied by TRH and the potential need to require a change of zoning is unnecessary.

29.     Defendant's attempt to regulate the operation of TRH is in essence a refusal to make a reasonable accommodation for the protected residents of TRH and is in violation of the law.

30.     The January 27, 2012 deadline imposed by Defendant for compliance with municipal licensing rules and a $500 possible if no action is taken is a clear and present threat to the primacy of the Fair Housing Act as it applies here.

WHEREFORE, Plaintiff Touchstone Recovery Homes, LLC, prays this Honorable Court issue an Order to Show Cause as to why Defendant should not be enjoined from subjecting Plaintiffs to regulation and inspection in contradiction to the Federal Fair Housing Act provision

prohibiting discrimination and award it damages for its Complaint in an amount not less than the jurisdictional limits herein plus costs, interest and attorney fees.

I declare under the penalties of perjury that the above statements are true to the best of my information and belief.

Dated: January 30, 2012

s/Kevin O'Hare, Plaintiff
Touchstone Recovery Homes LLC
Its President

Dated: January 30, 2012

Respectfully submitted,

s/Morris H. Goodman
Dagher Goodman Dagher, PLLC
14207 Ford Rd.
Dearborn, MI 48126-3148
313- 846-1900
Attorney for Plaintiff
goodmandet@comcast.net
P14166

# EXHIBIT A

/10/12                                              mail (1700×2338)



# City of Riverview

14100 Civic Park Drive
Riverview, MI 48193-7600

(734) 281-4200 · Fax (734) 281-4228

May 31, 2011

Mr. Kevin O'Hare, Co-director
Touchstone Recovery Home
13329 Pennsylvania Street
Riverview, MI 48193

Rev. Dr. William Promesso, Pastor
St. Cyprian Parish
13329 Pennsylvania Street
Riverview, MI 48193

Re:     Adult Foster Care Home
        13249 Pennsylvania Street, Riverview, Michigan
        Potential Zoning Violation

Dear Mr. O'Hare and Rev. Dr. Promesso;

The Community Development Department has been notified that an adult foster care
facility is operating from the former rectory of St. Cyprian Parish. The address is 13329
Pennsylvania Street in the City of Riverview, Michigan. The facility is operated by
Touchstone Recovery Home based on our search.

A concern is that the property is not correctly zoned (PSP Public/Semi-public) for an
adult foster care facility. To accurately evaluate the Zoning Ordinance in reference to
the facility, please provide the following information:

- Company/corporation name and address of service provider
- Name and title of contact person of service provider
- Number of adults residing at the former rectory at 13329 Pennsylvania Street
- Description of services provide including type of care, length of care
- Other operational information

Touch Stone Recovery Home
13329 Pennsylvania Street
May 31, 2011
Page 2 of 2

We thank you for your cooperation in this matter. Please respond by Thursday June 9,
2011 to avoid assigning of this matter to code enforcement.

The department telephone number is 734.281.4242 X331. My direct telephone number
is 734.281.4204. The e-mail address is dscurto@cityofriverview.com.

Sincerely,

David Scurto, AICP, PCP
Director of Community Development

cc.     Dean Workman         City Manager
        Randall Pentiuk      Pentiuk, Couvreur & Kobiljak
        Ron Lammers          Code Enforcement

dtps://mail.google.com/mail/?ui=2&ik=d7dca7e9de&view=att&th=134c86b3...

1

# EXHIBIT B



*"Providing Transitional Housing and Treatment for Men and Women Seeking a New Life"*

David Scurto
Director of Community Development
City of Riverview
14100 Civic Park Drive
Community Development
Riverview, MI 48193-7600

May 31, 2011

**Re:    Request for Information for Zoning Determination**

Dear Mr. Scurto,

I am writing this letter in response to your inquiries into the operation of the former Rectory at St. Cyprian Catholic Church, as a Recovery Residence by the enrollees of Touchstone Recovery Homes, TRH. The current and proposed use of the facility does not constitute a change in the status of the dwelling, with respect to its zoning currently or in the past. It is indeed, being used in a manner consistent with its notorious and open use, over many years. The residents of the Rectory at St. Cyprian, are a protected class under the Federal Fair Housing Act, FFHA, based on their familial status and handicap. As such, there is no reason to examine further the zoning of the dwelling, nor the potential need to require a change of zoning.

It is hoped with this letter, that I may explain to you the reasoning for this statement, and the concept that encompasses operations at TRH. I would appreciate the opportunity to discuss the implications of the FFHA on the City of Riverview, and at the very least, its requirement to make reasonable accommodation for the protected class that calls the Rectory "Home"; so that any inconvenience of the residents is abated.

The Rectory is designed to be a therapeutic community, where men of like intent, are allowed to obtain, implement, and perfect skills, that are necessary to afford them therapeutic relief from their handicap. Through a continuum of care, TRH will develop and sustain health and human services for its residents and their families. Recovery Residences, such as the one operated by TRH at the Rectory, are considered dwellings by the FFHA. Courts have applied the FFHA to a group home for recovering alcoholics, *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725 (1995), a homeless shelter, *Turning Point v. City of Caldwell*, 74 F. 3d 941 (9th Cir. 1996), a

1

group home for the mentally retarded, *Bangerter v. Orem City Corp.*, 46F. 3d 1491 (10th Cir. 1995), a residential drug rehabilitation facility, *U.S. v. Southern Management Corp.*, 955 F.2d 914 (4th Cir. 1992), a residential school for emotionally disturbed adolescents, *United States v. Massachusetts Indus. Finance Agency*, 910 F. Supp. 21 (D Mass. 1996), a shelter for homeless battered women and families, *Woods v. Foster*, 884 F. Supp. 1169 (N.D. Ill. 1995), an adult care facility for homeless persons with HIV, *Support Ministries for Persons with AIDS, Inc. v. Village of Waterford*, NY, 808. F. Supp. 120 (N.D.N.Y. 1992), a children's home, *United States v. Hughes Memorial Home*, 396 F. Supp 544 (W.D. Va. 1975), and a substance abuse residential treatment program, *Lakeside Resort Enterprises, LP v. Board of Supervisors of Palmyra Twshp.*, 455 F.3d 154, 158 (3d. Cir 2006).

In *Community House, Inc. v. City of Boise*, 490 F.3d 1041, 1044 n.2 (9th Cir. 2007) (rehearing en banc), the court concluded "the Community House facility was not merely transient housing, and it had "little trouble concluding" that it qualified as a dwelling under the Federal Fair Housing Act." The court further noted that regulations implementing the Fair Housing Act Amendments with respect to disability, specifically listed as an example of a dwelling "shelters intended for occupancy **as a residence for homeless persons**", Community House 490 F.3d at 1044 n.2 (citing 24 C.F.R. § 100.201)

The residents of the Rectory are considered "disabled" under the 1988 amendments to the Federal Fair Housing Act. *See* 42 U.S.C. 3600 *et seq.* Recovering addicts and alcoholics are specifically included within the definition of "handicapped individual." *See*, 42 U.S.C. 3605(h) and 24 C.F.R. 100.201(a)(2). *See also, City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725 (1995). The Fair Housing Act was amended to include handicapped individuals within its parameters, and to guarantee the ability of these individuals to live in the residence of their choice within their community. *See Oxford House - Evergreen v. City of Plainfield*, 769 F. Supp. 1329 (D. N.J. 1991)(noting that residents of an Oxford House in Plainfield, New Jersey, "are part of nationally recognized program which, through peer pressure and strict conditions of abstinence, successfully maintains freedom from addiction and improves the lives and opportunities of its participants.") *Oxford House, Inc. v. Township of Cherry Hill*, 799 F. Supp. 450 454 (D.N.J. 1992)(There is a shortage of adequate housing in New Jersey for recovering substance abusers and alcoholics. Closing down the Oxford House and forcing the residents to leave would be extremely detrimental to their recovery and would substantially increase the likelihood of relapse). As recovering alcoholics and addicts who cannot presently live independently or with their natural families, plaintiffs are individuals with handicaps within the meaning of the Federal Fair Housing Act, *City of Plainfield* at 1342.

Under 42 U.S.C. 3604(f)(l) it is unlawful:

To discriminate in the sale or rental, or to otherwise make unavailable or deny a dwelling to any buyer or renter because of a handicap of --

(A) That buyer or renter
(B) A person residing in or intending to reside in that dwelling after it is so sold, rented, or made available;

or

(C)    Any person associated with that buyer or renter.

As a member of a protected class under the Federal Fair Housing Act, the issue of whether TRH would be in violation of local zoning ordinances, requiring a change of zoning, special use or conditional use permits, is not relevant to the question of federal law. *United States v. Borough of Audubon*, 799 F. Supp. 353, *aff'd* 968 F.2d 14 (3d Cir. 1992). "Thus, any allegation that 901 SW 67th Avenue and 8160 SW 3rd Place have violated a local zoning ordinance does not abrogate its right in claiming discrimination under the Federal Fair Housing Act. it is well established that the FFHA prohibits discriminatory land use decision by municipalities, when such decisions are ["ostensibly authorized by local ordinance."] *Oxford House - Evergreen v. City of Plainfield*, supra. (on motion for preliminary injunction: city's enforcement of zoning ordinances so as to prevent local operation of local Oxford House in an area zoned for single family residences in violation of the Federal Fair Housing Act); *Association of Relative and Friends of AIDS patients v. Regulation and Permits Administration*, 740 F. Supp. 95 (D.P.R. 1990)(government agency's of a land use permit to open AIDS hospice violated Federal Fair Housing Act); *Baxter v. City of Belleville*, 720 F. Supp. 720 (S.D. Ill 1989)(on motion for preliminary injunction: city's refusal to issue special use permit under zoning law to develop and remodel building into residence for persons with AIDS violated the Fair Housing Act). *See also* 42 U.S.C. Section 3615 ("any law of a State, a political subdivision, or other jurisdiction that purports to require or permit any action that would be a discriminatory housing practice under this subchapter shall to that extent be invalid [under the Fair Housing Act]".)

In addition, for the purposes of this section, 42 U.S.C. 3604(f)(3)(B) defines discrimination to include "refusal to make a reasonable accommodation rules, policies, practices, or services, when such accommodation may be necessary to afford such [handicapped] person equal opportunity to use and enjoy a dwelling."

The legislative history to the Federal Fair Housing Amendments Act of 1988 ("House Judiciary Report") is explicit as to the effects of the amendments to state and local land use practices, regulations, or decisions which would have the effect of discriminating against individuals with handicaps. The amendments prohibit the discriminatory enforcement of land use law to congregate living arrangements among non-related persons with disabilities, such as the case law outlined in the aforementioned *States v. Borough of Audubon*, 799 F. Supp. 353, *aff'd* 968 F.2d 14 (3d Cir. 1992) with respect to those properties, when these requirements are not imposed on traditional families per se.

> [Section 804(f)] would also apply to state and local land use and health and safety laws, regulations, practices or decisions which discriminate against individuals with handicaps. While state and local governments have authority to protect safety and health, and to regulate use of land, that authority has been used to restrict the ability of individuals with handicaps to live in communities. This has been accomplished by the enactment or imposition of health, safety or land-use requirements on congregate living arrangements among non-related persons with disabilities. Since the requirements are not imposed on traditional

3

families per se and groups of similar size of unrelated people, these requirements have the effect of discriminating against persons with disabilities.

House Report, p. 24 (footnote omitted). Based on this clear expression of legislative intent, the courts have enjoined the application and enforcement of zoning and health and safety regulations which have a discriminatory impact on group homes for persons with disabilities. *City of Plainfield*, 769 F. Supp. at 1343-1344; *Township of Cherry Hill*, 799 F. Supp. at 462; *Oxford House, Inc. v. Town of Babylon*, 819 F. Supp. 1179 (E.D.N.Y. 1993); *Marbrunak, Inc. v. City of Stowe*, 974 F.2d 43 (6th Cir. 1992); *A.F.A.P.S. v. Regulations and Permits Administration*, supra al 106-107; *Tsombonidis v. City of West Haven*, 180 F. Supp. 2d 262, *aff'd in part, rev'd in part*, 352 F. 3d 565 (2d Cir. 2003).

The reasonable accommodation requirement of the Fair Housing Act draws no distinction between "rules," "policies" and "practices" that are embodied in zoning ordinances and those that emanate from other sources. All are subject to the "reasonable accommodation" requirement. Thus, when a municipality refuses to make a reasonable accommodation in its zoning "rules", "policies" or "practices," and such accommodation may be necessary to afford handicapped persons an equal opportunity to use and enjoy a dwelling, it violates the reasonable accommodation provision of the act, 42 U.S.C. 3604(f)(3)(B). *See United States v. City of Marshall*, 787 F. Supp. 872, 877 (W.D. Wis. 1991)(Congress in enacting the Fair Housing Amendments Act "anticipated that there were rules and regulations encompassing zoning regulations and governmental decision about land use"); *See Joint Statement of the Department of Justice and the Department of Housing and Urban Development: Group Homes, Land Use, and the Fair Housing Act*, 2004.

It is well established that the "rules" and "policies" to which an accommodation may be required include municipal land use and zoning laws. *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725 (1995). Reasonable accommodation has been interpreted by the Courts in cases involving zoning ordinances to mean that a municipality must change some rule that is generally applicable to everyone so as to make its burden less onerous on the person with disabilities. *Township of Cherry Hill* at 465 ft. 25. *See Casa Marie, Inc. v. Superior Court of Puerto Rico for the District of Arecibo*, 752 F. Supp. 1152, 1169 (D.P.R. 1990) *rev'd on other grounds*, 98 F.2d 252 (1st Cir. 1993)(noting that at a court hearing a reasonable accommodation claim under the Fair Housing Act may "adjudge whether compliance with the zoning ordinances may be 'waived'"); *Horizon House Development Services v. Township of Upper Southampton*, 804 F. Supp. 683, 699-700 (E.D. Pa 1992). *aff'd mem.*, 995 F. 2d 217 (3d Cir 1993)("affirmative steps are required to change rules or practices if they are necessary to allow a person with a disability to live in a community"). A request for a reasonable accommodation may even encompass as a request for non enforcement of a zoning ordinance. *Proviso Association of Retarded Citizens v. City of Westshester*, 914 F Supp. 1555, 1561-62 (N.D.Ill 1996).

One of the purposes of the reasonable accommodations provision is to address individual needs and to respond to individual circumstances. In this regard, courts have held that municipalities must change, waive, or make exception to their zoning rules to afford people with disabilities the same access to housing as those who are without disabilities. *Town of Babylon*, 819 F. Supp. at 1192; *Horizon House*, 804 F. Supp. at 699; *Township of Cherry Hill*, 799 F. Supp. at 461-63;

4

*City of Marshall*, 787 F. Supp. at 878; *Commonwealth of Puerto Rico*, 764 F. Supp. at 224. The overwhelming weight of authority is that reasonable accommodation under the Act are to be considered based on the individual factual circumstances based on each case, *See, e.g., Giebler v. M & B Associates.*, 343 F. 3d 1143, 1156 (9th Cir. 2003)(:circumstances may make it reasonable for certain defendants to make accommodations even where such accommodations are not reasonable in most cases"); *Wisconsin Community Services, Inc. v. City of Milwaukee*, 465 F 3d 737, 753 (7th Cir. 2006) (en banc); *Dadian v. City of Wilmette*, 269 F. 3d 831, 838 (7th Cir. 2001)(whether a requested accommodation is reasonable is factually determined by an inquiry balancing the cost to the defendant and the benefit to the plaintiff); *Hovson's, Inc. v. Township of Brick*, 89 F. 3d 1096, 1104 (3d Cir. 1996); *United States v. California Mobile Home Park Mgmt. Co.*, 29 F. 3d 1413, 1418 (9th Cir. 1994); *Developmental Services of Nebraska v. City of Lincoln*, 504 F. Supp. 2d 714, 723 (D, Neb. 2007); *Advocacy Center for Persons with Disabilities, Inc., v. Woodland Estates Assoc., Inc.*, 192 F Supp 2d 1344 (M. D. Fla. 2002).

In this case, accommodating TRH, would not cause the City of Riverview any undue or unnecessary financial or administrative burdens, nor would it undermine the purposes which it seeks to achieve. *See, City of Marshall*, supra at 877-78 (accommodation is unreasonable if it "undermine[s] the basic purpose which the requirement seeks to achieve"). The FFHA places an affirmative duty on the municipality to accommodate the needs of persons with disabilities. The Act demands that municipalities, such as the City of Riverview, change the manner in which its zoning ordinances are applied and enforced, to afford the disabled the same opportunity to housing as those who are not disabled. *City of Plainfield*, 769 F. Supp. at 1344 (accommodation is reasonable where it "would not cause undue financial burden to the City").

Permitting TRH to exist at the building at 13249 Pennsylvania Road, formerly known as the Rectory of St. Cyprian Catholic Church, would not significantly compromise the policies reflected in any of the land use ordinances that the City would apply or enforce. Nor does there exist any significant evidence that such an accommodation would monumentally compromise the City's legitimate interest in protecting the character of the surrounding neighborhood. The City is not requested to build or make available to the citizens of the city any structures, rather, the City is being requested to remove obstacles and impediments to housing for a protected class of individuals. *See Town of Babylon, supra; Huntington Branch NAACP v. Town of Huntington*, 844 F. 2d 926, 936 (2d Cir.) *aff'd* 488 U.S. 15 (1988).

The residents of TRH, are and will be, individuals who are handicapped by alcoholism or substance use disorders. These individuals need a living arrangement, such as that provided by the former Rectory, wherein groups of unrelated individuals reside together in a residential area for mutual support during the recovery process. *Township of Cherry Hill*, 799 F. Supp. at 450 ("when that home is also a therapeutic environment critical to maintaining continued recovery from alcohol or drug addiction, eviction is life threatening. Depriving such individuals of housing or evicting them, would constitute irrational discrimination that may seriously jeopardize their continued recovery." *See City of Plainfield*, 769 F. Supp. at 1345. TRH can demonstrate that the ability of recovering alcoholics and drug addicts to live in a supportive drug

free environment, in a quiet residential area, is critical to their recovery.[1]   Denying any reasonable accommodation, such as a waiving of enforcement, would completely preclude TRH's ability to provide housing and support services to the alcoholic and drug dependent people we serve in the City of Riverview and the downriver community as a whole.

It is our fervent hope, that you will find this information useful, and that a reasonable course of action may be taken that allows us to cooperate in our efforts to provide a better quality of life for all.


Very respectfully yours,

**Kevin O'Hare**
**Program Director**
**TOUCHSTONE RECOVERY**

---

[1] Similar programs to TRH have successfully demonstrated the need of recovering individuals to reside in a quiet residential area in order to enhance the recovery process. *See Borough of Audubon*, 797 F. Supp. at 360 ("Based on testimony, we find that the OH-Vassar residents' addictions substantially limit their ability to live independently or to live with their families. Accordingly, we find that the residents are "handicapped" under the Act, and are entitled thereby to the protections of the Act. We do not think that the list of major life activities set forth in the regulation was meant to be all-inclusive. Even if it were, the residents would still satisfy the definition because their inability to live independently constitutes a substantial limitation to their ability to 'care for themselves.'") *City of Plainfield*, 769 F. Supp. at 1339-40 ("In addition to losing their residence, which may be in itself an irreparable injury, plaintiffs would also lose the benefit of their therapeutic and supportive living environment, and may relapse...For a non-handicapped individual, the disintegration of the family unit is traumatic, for recovering alcoholics and addicts, it may be devastating.")

# EXHIBIT C



# City of Riverview

14100 Civic Park Drive
Riverview, MI 48193-7600

(734) 281-4200 · Fax (734) 281-4228

December 12, 2011

Touchstone Recovery
13249 Pennsylvania Road
Riverview, MI  48193

Dear Business Owner:

Re:  13249 Pennsylvania Road, Riverview

In accordance with the City of Riverview Code of Ordinances, anyone conducting a business, trade, or occupation within the city limits must annually obtain a Business License or Registration and pay the appropriate fees.

Enclosed is an application and necessary paperwork.  The Emergency Contact form must be submitted, as it is kept on file in the Police Department in the event of an emergency during non-business hours.  Please complete and return all forms to the City Clerk's Office within ten (10) days from the above date.  Failure to do so could result in a civil infraction.

In order to process your business license application you must submit:
- A letter describing in detail the exact nature of your business, including the various services your company performs
- Equipment on site
- Storage and inventory arrangements
- Any other information that applies to your business
- A drawing or sketch of your site plan
- The number of parking spaces
- Centrally monitored smoke/heat rise alarm if your business is not open 24 hours per day.

Remember to include as much detail as possible.

A business license application will proceed through the following steps when submitted:
- Zoning approval by the Community Development Department
- All necessary building, electrical and plumbing permit approvals by the Building and Engineering Department
- Fire code approval by the Fire Department
- Business Certificate of Occupancy granted by the Building Department

*NOTE: Occupation of a building and/or the operation of a business, prior to receiving approvals and licensing by these departments, may result in the issuance of a written citation to the business owner and/or occupant.*

Please include a first time application fee of $35.00 and an inspection fee of $40.00 for the Building Department inspections. The actual license fee varies depending on the type of business, and is due upon final approval of your application.

Please be advised that all taxes must be paid prior to issuance of your business/registration license.

If I can be of further assistance, please contact our office at (734) 281-4240.

Sincerely,

Sandra Miller
City Clerk's Office

Enc.

co: Code Enforcement



# RIVERVIEW CITY CLERK'S OFFICE

14100 Civic Park Drive, Riverview, MI 48193
Phone: (734) 281-4240  Fax: (734) 281-4228

## NEW BUSINESS LICENSE APPLICATION

FOR OFFICE USE ONLY:

Date Issued:

License Number:

ATTACH ADDITIONAL SHEETS AS NECESSARY

**BUSINESS LICENSE** _____    **HOME OCCUPATION** _____    **PROFESSIONAL REGISTRATION** _____

_____          _____
**DBA** (Doing Business As)                                **BUSINESS NAME**

_____  **RIVERVIEW, MI 48193**  _____
**BUSINESS ADDRESS**                                              **BUSINESS PHONE**

_____   City        State    Zip        Cell or Home Phone #
**MAILING ADDRESS** (If different than above)

**DETAILED DESCRIPTION OF BUSINESS:**

|  |  |  |
|---|---|---|
| Professional Registration _____ | Housing Registration _____ | Instructional Classes _____ |
| Builder / Contractor _____ | Vehicle _____ | Salon _____ |
| Retail / Wholesale _____ | Manufacturing _____ | Food / Restaurant _____ |
| Distributor: _____ | | Other Describe : _____ |

**LIST OWNERS, PARTNERS OR PERSONS MANAGING THIS LOCATION:**

Name(s)                    Title              Residence Address, City, State, Zip        Cell or Home Phone #

_____   _____   _____   _____

_____   _____   _____   _____

**LIST LOCAL CONTACT PERSONS FOR INQUIRIES AND/OR EMERGENCIES:**

Name                                    Title                          Cell or Home Phone #

_____   _____   _____

_____   _____   _____

**LIST ANY OTHER BUSINESSES OWNED OR OPERATED IN MICHIGAN:**

Name                              City, State & Zip                    Cell or Home Phone #

_____   _____   _____

_____   _____   _____

**Have you ever been charged or convicted of a misdemeanor or felony?  Yes ___ No__  If yes, the Date:** _____
**Court:** _____ **Charge:** _____
**Outcome:** _____

| | | | |
|---|---|---|---|
| **Inspection Fee:** | $ 40.00 | Date Paid: _____ | |
| **1st Time App. Fee:** | $ 35.00 | Date Paid: _____ | |
| **License Fee:** | $ _____ | Date Paid: _____ | |
| **Total:** | $ _____ | | |

_____          _____
**Print Name and Title**                              **Date of Application**

**A COPY OF APPLICANT'S DRIVERS LICENSE
IS REQUIRED AT TIME OF FILING.**

_____
**Signature of Owner / Applicant**

FOR OFFICE USE ONLY:

Business Name: _____  Date: _____

Business Address: _____  Business Phone #: _____

## BUSINESS EMERGENCY CONTACTS – POLICE DEPARTMENT

This data is requested by the Riverview Police Department for emergency contact information only in the event of a robbery, water main break, or other emergency.  The Riverview Police Department supports a proactive approach to building security from a crime prevention standpoint and recommends a few inexpensive suggestions:

- **Locks** – High security/case hardened locks, solid core wood or metal doors for the exterior as well as security glass in doors (if equipped) to prevent access to door locks being defeated.  40 inch rule: Any glass within 40 inches of a door lock should be protected.
- **Building Exterior**: Unsecured ladders, rocks, debris and large trees/shrubs, etc. should be removed to promote better observation from the exterior by Police and citizens.
- **Outside Lighting** – Appropriate amount for adequate coverage of parking lot and exterior of building.  Leave lights on during hours of darkness to assist officers with checking the area while on patrol.  180 degree viewers installed on rear doors.
- **Security Cameras** – The lenses of all security cameras should be free of all obstructions and in good working order.
- **Alarms** – Should be well maintained.  Persons with the authority to deactivate the alarm should be listed as emergency call out persons in the event the owner is not available.
- **Dumpster Areas** – Should be kept away from the building and locked or contained by chain link denying access or concealment opportunities.
- **Outside Observations** – Owners of businesses should observe the outside of their businesses with security in mind.  All suspicious activity should be reported to the Police Department.
- **Retail business handling cash** - Should have a safe or bank drop procedures as well as a robbery prevention program in place including signage inside stating "theft will not be tolerated and will be prosecuted to the fullest extent of the law".

**Call 281-4222 if assistance is required.**

Applicant's Full Name: _____

Applicant's Drivers License #:_____  Applicant's Date of Birth:_____
**(Copy required)**

Home Address: _____  City: _____  State: _____  Zip: _____

Applicant's Home Phone: _____  Cell Phone Number: _____

### #1) Local Emergency Call-Out Person:

_____

Name                            Relationship                        Phone #

### #2) Local Emergency Call-Out Person:

_____

Name                            Relationship                        Phone #

**BUSINESS NAME:** _____    **DATE:** _____

**STREET ADDRESS:** _____    **PHONE:** _____

## BACKGROUND HISTORY:

Approved _____ Denied _____ Pending _____ Signature: _____ Date: _____

COMMENTS: _____
_____
_____
_____
_____

## ZONING APPROVAL:                    ZONED: _____

Approved _____ Denied _____ Pending _____ Signature: _____ Date: _____

COMMENTS: _____
_____
_____
_____
_____

## BUILDING & ENGINEERING:

Approved _____ Denied _____ Pending _____ Signature: _____ Date: _____

COMMENTS: _____
_____
_____
_____
_____

## FIRE DEPARTMENT:

Approved _____ Denied _____ Pending _____ Signature: _____ Date: _____

COMMENTS: _____
_____
_____
_____
_____

Revised 03-22-11

## ATTENTION BUSINESS LICENSE APPLICANT

In order to process your business license application, you must submit:
- A letter describing in detail the exact nature of your business.
- Include the various services your company performs including:
  Equipment on site
  - Storage and inventory arrangements
  - Any other information that applies to your business.
- A drawing or sketch of your site plan.
- The number of parking spaces.
- Centrally monitored smoke/heat rise alarm if you business is not opened 24 hours per day.
- A $40.00 application fee for the building inspection.

**Remember to include as much detail as possible.**

A business license application will proceed through the following process when submitted:
- Zoning approval by the Community Development Department.
- All necessary building, electrical, mechanical and plumbing permit approval by the Building and Engineering Department.
- Fire code approval by the Fire Department.
- Background Approval.
- Business Certificate of Occupancy granted by the Building Department.

NOTE: Occupation of a building and/or the operation of a business prior to receiving all approvals and licensing by these departments may result in the issuance of a written citation to the business owner and/or occupant.

# COMMON BUSINESS VIOLATIONS

Addresses must be clearly visible from the street, 5" to 6" numbers, contrasting color to the building.

Exit lights must be installed over all exit doors, hard wired with battery back up. Must be fully operational during all business hours. No burned out light bulbs.

Emergency lighting must be hard wired, with battery back up. Must be fully operational during all business hours.

Electrical service panels and heat producing appliances must have 36" clearance to storage of any kind.

All electrical junction boxes must have proper covers in place.

Extension cords are not to be used as permanent wiring; sufficient duplex outlets must be provided for all electrical appliances.

General housekeeping must be neat and orderly, storage and rubbish must be removed from aisle way and exit access ways.

Fire extinguishers must be mounted in clear view and easily accessible. Must be serviced and tagged annually.

Dumpsters must be a minimum of 15 feet from the building.

Compressed gas cylinders must be chained in place to prevent tipping.

Penetrations in walls and ceiling must be repaired. No missing ceiling tiles.

Commercial kitchen appliances plus hood and duct system must be cleaned regularly and maintained free of grease accumulation.

Commercial kitchen suppression systems must be serviced semi-annually.

# EXHIBIT D



# City of Riverview

14100 Civic Park Drive
Riverview, MI 48193-7600

(734) 281-4200 · Fax (734) 281-4228

January 13, 2012
**SECOND REQUEST**

Touchstone Recovery
13249 Pennsylvania Road
Riverview, MI  48193

Dear Business Owner:

It appears that you are operating a business within the city limits.  In accordance with
Section 14-34 of the Riverview Code of Ordinances, all businesses must be licensed or
registered with the City Clerk's office on an annual basis.  A correspondence to this
effect was mailed to you on December 12, 2011.  As of this writing, I have not received a
response.

Enclosed is another application.  Please complete it and return it to the City Clerk's
Office no later than January 27, 2012.  Failure to obtain a license, if you are in fact
operating a business, may result in a violation (a ticket in the amount of $500.00) and late
fees ($10.00 per day) for conducting a business without a license.  If you are not
conducting a business, please send a notice in writing.

The first time application fee of $35.00 must be accompany your application as well as an
inspection fee of $40.00.   The actual license fee varies dependent upon the type of
business and is due once your application is approved and license issued.
If I can be of further assistance, please contact me at (734) 281-4240.

Sincerely,

Sandra Miller
City Clerk's Office

Enc.

cc:  Code Enforcement



# RIVERVIEW CITY CLERK'S OFFICE
14100 Civic Park Drive, Riverview, MI 48193
Phone: (734) 281-4240  Fax: (734) 281-4228

FOR OFFICE USE ONLY

Date Issued:

License Number:

### NEW BUSINESS LICENSE APPLICATION

ATTACH ADDITIONAL SHEETS AS NECESSARY

**BUSINESS LICENSE** _____     **HOME OCCUPATION** _____     **PROFESSIONAL REGISTRATION** _____

**DBA (Doing Business As)** _____     **BUSINESS NAME** _____

**BUSINESS ADDRESS** _____ RIVERVIEW, MI 48193 _____     **BUSINESS PHONE**

**MAILING ADDRESS (If different than above)**     City     State     Zip     Cell or Home Phone #

**DETAILED DESCRIPTION OF BUSINESS:**

_____

_____

_____

| | | |
|---|---|---|
| Professional Registration | Housing Registration | Instructional Classes _____ |
| Builder / Contractor | Vehicle _____ | Salon _____ |
| Retail / Wholesale | Manufacturing _____ | Food / Restaurant _____ |
| Distributor: _____ | | Other Describe: _____ |

**LIST OWNERS, PARTNERS OR PERSONS MANAGING THIS LOCATION:**

Name(s)          Title          Residence Address, City, State, Zip          Cell or Home Phone #

_____     _____     _____     _____

_____     _____     _____     _____

**LIST LOCAL CONTACT PERSONS FOR INQUIRIES AND/OR EMERGENCIES:**

Name                              Title                              Cell or Home Phone #

_____     _____     _____

**LIST ANY OTHER BUSINESSES OWNED OR OPERATED IN MICHIGAN:**

Name                              City, State & Zip                              Cell or Home Phone #

_____     _____     _____

_____     _____     _____

Have you ever been charged or convicted of a misdemeanor or felony? Yes __ No __ If yes, the Date: _____
Court: _____ Charge: _____
Outcome: _____

| | | |
|---|---|---|
| Inspection Fee: | $ 40.00 | Date Paid: _____ |
| 1st Time App. Fee: | $ 35.00 | Date Paid: _____ |
| License Fee: | $ _____ | Date Paid: _____ |
| Total: | $ _____ | |

Print Name and Title _____     Date of Application _____

**A COPY OF APPLICANT'S DRIVERS LICENSE
IS REQUIRED AT TIME OF FILING.**

Signature of Owner / Applicant _____

FOR OFFICE USE ONLY:

Received by: _____ Date: _____ Check #: _____     Taxes Paid: Yes ____ No ____ Owes $ _____     Revised 03-22-11

Business Name: _____

Business Address: _____ Date: _____

## BUSINESS EMERGENCY CONTACTS – POLICE DEPARTMENT

This data is requested by the Riverview Police Department for emergency contact information only in the event of a robbery, water main break, or other emergency.   The Riverview Police Department supports a proactive approach to building security from a crime prevention standpoint and recommends a few inexpensive suggestions:

- **Locks** – High security/case hardened locks, solid core wood or metal doors for the exterior as well as security glass in doors (if equipped) to prevent access to door locks being defeated.  40 inch rule; Any glass within 40 inches of a door lock should be protected.
- **Building Exterior**: Unsecured ladders, rocks, debris and large trees/shrubs, etc. should be removed to promote better observation from the exterior by Police and citizens.
- **Outside Lighting** – Appropriate amount for adequate coverage of parking lot and exterior of building.  Leave lights on during hours of darkness to assist officers with checking the area while on patrol.  180 degree viewers installed on rear doors.
- **Security Cameras** – The lenses of all security cameras should be free of all obstructions and in good working order.
- **Alarms** – Should be well maintained.  Persons with the authority to deactivate the alarm should be listed as emergency call out persons in the event the owner is not available.
- **Dumpster Areas** – Should be kept away from the building and locked or contained by chain link denying access or concealment opportunities.
- **Outside Observations** – Owners of businesses should observe the outside of their businesses with security in mind.  All suspicious activity should be reported to the Police Department.
- **Retail business handling cash** - Should have a safe or bank drop procedures as well as a robbery prevention program in place including signage inside stating "theft will not be tolerated and will be prosecuted to the fullest extent of the law".

### Call 281-4222 if assistance is required.

Applicant's Full Name: _____

Applicant's Drivers License #:_____  Applicant's Date of Birth:_____
**(Copy required)**

Home Address: _____ City: _____ State: _____ Zip: _____

Applicant's Home Phone: _____ Cell Phone Number: _____

**#1) Local Emergency Call-Out Person:**

_____
Name                                          Relationship                           Phone #

**#2) Local Emergency Call-Out Person:**

_____
Name                                          Relationship                           Phone #

Revised 03-22-11

BUSINESS NAME: _____  DATE: _____

STREET ADDRESS: _____  PHONE: _____

## BACKGROUND HISTORY:

Approved _____ Denied _____ Pending _____ Signature: _____ Date: _____

COMMENTS: _____
_____
_____
_____
_____

## ZONING APPROVAL:                                    ZONED: _____

Approved _____ Denied _____ Pending _____ Signature: _____ Date: _____

COMMENTS: _____
_____
_____
_____
_____

## BUILDING & ENGINEERING:

Approved _____ Denied _____ Pending _____ Signature: _____ Date: _____

COMMENTS: _____
_____
_____
_____
_____

## FIRE DEPARTMENT:

Approved _____ Denied _____ Pending _____ Signature: _____ Date: _____

COMMENTS: _____
_____
_____
_____
_____



# City of Riverview

14100 Civic Park Drive
Riverview, MI 48193-7600

(734) 281-4200 · Fax (734) 281-4228

September 8, 2011

Mr. Kevin O'Hare, Co-director
Touchstone Recovery Home
13329 Pennsylvania Street
Riverview, MI 48193

Re:     **Touchstone Recovery Home**
        **13249 Pennsylvania Street, Riverview, Michigan**
        **Potential Zoning Violation**

Dear Mr. O'Hare;

The City of Riverview continues to review information in connection with Touchstone Recovery Home occupying the rectory of St. Cyprian Parish. We request Touchstone to provide a copy of the lease agreement with St. Cyprian Parish and with the Archdiocese of Detroit. In addition, a second request of Touchstone is to provide a copy of all agreements that their program residents enter into.

We thank you for your cooperation in this matter. Please respond by Thursday June 9, 2011 to avoid assigning of this matter to code enforcement.

The department telephone number is 734.281.4242 X331. The e-mail address is dscurto@cityofriverview.com.

Sincerely,

David Scurto, AICP, PCP
Director of Community Development

cc.     Dean Workman          City Manager
        Randall Pentiuk        Pentiuk, Couvreur & Kobiljak
        Ron Lammers            Code Enforcement

Google scholar  Oxford House, Inc. v. Township of Cherry Hill, 7  [Search]  Advanced Scholar Search

| Read this case | How cited | **Oxford House, Inc. v. Township of Cherry Hill, 799 F. Supp. 450 - Dist. Court, D. New Jersey 1992** |

Highlighting **Oxford House, Inc. v. Township of Cherry Hill, 799 F.Supp. 45** Remove highlighting

799 F.Supp. 450 (1992)

**OXFORD HOUSE, INC., and John Does One through Seven (Prospective Residents of 911 South King's Highway), Plaintiffs,**

**v.**

**TOWNSHIP OF CHERRY HILL, Defendant.**

Civ. No. 92-1150.

**United States District Court, D. New Jersey.**

September 10, 1992.

452   *451 *452 James Katz, American Civil Liberties Union of New Jersey, Tomar, Simonoff, Adourian & O'Brien, Haddonfield, N.J., for plaintiffs.

Francine I. Axelrad, Mun. Atty., **Cherry Hill**, N.J., for defendant.

## OPINION

GERRY, Chief Judge.

Plaintiffs are a group home for recovering drug addicts and alcoholics and its residents. They seek a preliminary injunction from this court preventing the **Township** of **Cherry Hill** from interfering with their rental and occupancy of a **house** located in a single family residential zone in **Cherry Hill**. The complaint and an application for a temporary restraining order were filed on March 20, 1992, after the **Township** refused to issue plaintiffs a Certificate of Occupancy ("C.O.") on the grounds that they failed to meet the definition of a "single family" under the **Township's** zoning ordinance. Without this C.O., plaintiffs were prohibited under the zoning ordinance from occupying the **house**. The complaint charges that **Cherry Hill's** action constitutes discrimination on the basis of handicap in violation of the federal Fair Housing Act, 42 U.S.C. § 3601 *et seq.* On the day the suit was filed, this court issued a temporary restraining order, enjoining the **Township** from interfering with the immediate occupancy of the **house** by plaintiffs. A preliminary injunction hearing was subsequently held on May 14, 1992. Based on the following findings of fact and conclusions of law, plaintiffs' request for a preliminary injunction will be granted.

## FINDINGS OF FACT

## A. *The Parties*

1. Plaintiff, **Oxford House, Inc.**, is a Maryland, not-for-profit, tax-exempt corporation which assists in the establishment of housing for recovering alcoholics and substance abusers. **Oxford House, Inc.** serves as the umbrella organization for a national network of approximately 400 individual **Oxford** Houses, approximately 20 of which are located in New

1/19/12

Case 5:12-cv-10485-JCO-MJH  ECF No. 1, filed 02/03/12  PageID.29  Page 29 of 49

Oxford House, Inc. v. Township of Cherry Hill, 799 F. Supp. 450 - Dist. Court,...

Jersey.

2. Plaintiffs, John Does One through Seven, are current residents of a newly-established **Oxford House** located at 911 South Kings Highway in **Cherry Hill**, New Jersey. They are all recovering alcoholics and substance abusers in need of housing, and they each have completed a rehabilitation program for either alcoholism or drug abuse prior to moving into the **house**.

3. Defendant, **Township** of **Cherry Hill**, is a municipal corporation located in Camden County, New Jersey, organized under the laws of the State of New Jersey. **Cherry Hill** exercises zoning authority over the land within its borders.

4. **Oxford** Houses are not health care facilities, rehabilitation centers, or supervised halfway houses. They are simply residential dwellings rented by a group of individuals who are recovering from alcoholism and drug addiction. Three basic rules govern the functioning of all **Oxford** Houses: each **house** must 1) be democratically self-governed by its residents, 2) be financially self-supporting, and 3) immediately expel any resident who relapses into drug and/or alcohol use. No professional treatment, therapy, or paid staff is provided. Unlike a boarding **house**, where a proprietor is responsible to run and operate the premises, at **Oxford House**, the residents are responsible for their own food and care as well as for running the home. Because the **house** must be self-supporting, each of the residents needs a source of income to pay his or her fair share of the expenses. [1]

453  *453 5. **Oxford House, Inc.** has entered into a contract with the State of New Jersey to administer a revolving loan fund, which makes start-up loans to help establish group homes for recovering alcoholics and substance abusers throughout the state. New Jersey set up this loan fund in accordance with the federal Anti-Drug Abuse Act of 1988, 42 U.S.C. § 300x-4a, under which states are required to initiate such loan funds in order to receive federal block grant funds for alcohol and drug abuse and mental health services under the Public Health Services Act, 42 U.S.C. §§ 300x and 300x-2. Under the Anti-Drug Abuse Act, groups of four or more recovering alcoholics or substance abusers who want to live in a group home are entitled to a loan of up to $4,000 to cover the start-up expenses of renting a **house**, including the security deposit and first month's rent. The loan must be repaid within two years. In order to be eligible for the funds, the houses must operate according to the basic **Oxford House** model; i.e., they must: 1) be democratically self-governing; 2) be financially self-supporting; and 3) prohibit the use of illegal drugs or alcohol on the premises and immediately expel any resident who resumes the use of drugs or alcohol. [2] *See* 42 U.S.C. § 300x-4a(a)(6).

6. Although **Oxford House, Inc.** provides assistance in setting up individual houses and provides technical support initially, once established, an individual **Oxford House** is no longer subject to direct, ongoing control by **Oxford House, Inc.** The residents of the **house** make all of the decisions regarding the management of the **house**, including decisions concerning new residents. This helps the residents to develop a sense of responsibility and self-esteem, which are important ingredients to a successful recovery.

7. **Oxford House, Inc.** attempts to locate houses in clean, drug-free, single family neighborhoods that will provide the occupants a sense of pride and self-worth. **Oxford House, Inc.** has found that the location of these houses in such neighborhoods plays a crucial role in an individual's recovery by promoting self-esteem, helping to create an incentive not to relapse, and avoiding the temptations that the presence of drug trafficking can create.

8. There is no limit on the amount of time an individual may reside in an **Oxford House**; as long as she does not resume the use of drugs or alcohol, meets the requisite financial obligations and does not engage in disruptive behavior, an individual could reside in an **Oxford House** indefinitely. At one of the original **Oxford** Houses, a resident stayed for 16 years. Most stay for shorter periods of time, however. In another **Oxford House** in **Cherry Hill**, which has been operating for two years, the average length of stay of the current residents has been six months to a year.

cholar.google.com/scholar_case?case=495959959689409068&q=Oxford...

2/1.

Oxford House, Inc. v. Township of Cherry Hill, 799 F. Supp. 450 - Dist. Court,...

## B. *The Dispute*

9. Early this year, **Oxford House, Inc.** made a decision to open up another **house** in **Cherry Hill** because the existing houses in Camden County were unable to meet the demand for suitable housing for recovering alcoholics and substance abusers in the area. Accordingly, in February of 1992, pursuant to **Oxford House, Inc.**'s contractual obligation with the State of New Jersey, it entered into a lease with a property management firm, Realco Management Inc., to rent the premises at 911 South Kings Highway for use as an **Oxford House**. In connection with this lease, a check in the amount of $2,875.00 was drawn from the New Jersey revolving loan fund and paid to Realco on March 5, 1992 to cover the first month's rent and security deposit. **Oxford House, Inc.** intended to have the **house** occupied beginning on March 15, 1992.

454    10. 911 South Kings Highway is a detached single family **house** located in a single family residential zone under the *454 **Township's** zoning ordinance. The property is located on a well-traveled street. Across the street from the **house** are a commercial office, two apartment complexes, a florist, and several offices in residential properties. On the same side of the street as the **house** are an office complex, a contractor who works out of his home, and residences mixed in with offices in residence-type buildings. Behind the **house** are another set of offices, as well as single family residences and duplexes.

11. Subsequent to entering into the lease with **Oxford House**, Realco applied to the **Township** for a Certificate of Occupancy pursuant to **Township** Ordinance 75-11, which requires a landlord to obtain a C.O. prior to any rental, including the rental of a single family home.[3] In order for a C.O. to be issued, the proposed use of the property must comply with the **Township's** zoning ordinance, as well as the **Township's** property maintenance code.

12. On March 11, 1992, Bernard Rosen, an inspector from **Cherry Hill**, inspected the premises pursuant to Realco's C.O. application. At the time of the inspection, he was informed that the prospective tenant was to be **Oxford House**. Mr. Rosen then informed Realco that he would have to report to the **Township** that **Oxford House** was the prospective tenant, and he told Realco that this "was a problem." Rosen subsequently did inform the **Township's** Director of Community Development, William Ragozine, that the **house** was to be occupied by **Oxford House**.

13. On the same day as Rosen's inspection, Francine Axelrad, attorney for **Cherry Hill**, wrote to Realco informing them that their application for a C.O. had been denied.[4] Her letter stated that the basis for the denial was that "**Oxford House** does not satisfy the definition of a single family under the **Township's** Zoning Ordinance."[5]

14. As a result of this letter, Realco Management sought to return the first month's rent and security deposit and sever its relationship with **Oxford House**. On March 20, 1992, however, this court entered a temporary restraining order, enjoining the **Township** from interfering with plaintiffs' occupancy of 911 South Kings Highway. Pursuant to that order, the **Township** reinspected the premises for maintenance code violations and, finding no such violations, issued a C.O. on March 30, 1992.

455    15. Since April 1, 1992, 911 South Kings Highway has been occupied by a group of recovering alcoholics and substance abusers. Since that time, there have been no *455 complaints from the neighbors or anyone else concerning the use of the premises.

16. In addition to 911 South Kings Highway, **Oxford House** also operates group homes at 141 Pine Valley Road and 108 Hilltop Court in **Cherry Hill**. The **Township** has previously filed suit in state court to evict the residents of those two homes because of their failure to meet the definition of family under the zoning ordinance.[6] None of the residents of those properties have been charged with any violation of any municipal ordinance in connection with their conduct at the residences, and none of those residents have been arrested for unauthorized use of drugs or alcohol at the premises. William Ragozine, the Director of Community Development for

of alcohol at the premises. William Ragozine, the Director of Community Development for **Cherry Hill**, testified that neither he nor his department have any information indicating that the presence of these houses has had any adverse impact on the surrounding neighborhoods.

# C. *The Township's Zoning Ordinance*

17. Under the **Cherry Hill** Zoning Ordinance, a "family" is defined as:

> a single individual doing his own cooking and living upon the premises as a separate housekeeping unit, or a collective body of persons doing their own cooking and living together upon the premises as a separate housekeeping unit in a domestic relationship based upon birth, marriage or other domestic bond.

**Cherry Hill** interprets this ordinance so as to impose more stringent requirements on groups of unrelated individuals seeking to rent a single family home than on groups who are related by blood or marriage. While groups related by blood or marriage who apply for a C.O. are automatically considered to meet the definition of family under the zoning ordinance, a group of unrelated individuals is initially presumed not to constitute a family. In order to obtain a C.O., a group of unrelated individuals must prove that they meet a standard of "permanency and stability." This standard is never imposed on groups related by blood or marriage because they are automatically found to meet the definition of "family" regardless of their particular circumstances. This "permanency and stability" standard is not referred to or defined anywhere in the zoning ordinance, and the **Township** has no written criteria according to which the standard may be uniformly applied.

18. When a group of people related by blood or marriage applies for a C.O., assuming that other requirements under the property maintenance code are met, it will be automatically granted on the basis of a simple application form which asks for little more than the proposed tenants' names. When a group of unrelated individuals applies for a C.O., however, it will initially be denied on the ground that they do not meet the definition of a single family.[7] The group can then only obtain a C.O. by applying to the **Cherry Hill** Zoning Board for a variance or an interpretation. The Zoning Board will then hold public hearings, at which the group members must present testimony establishing that they meet the vague standard of "permanency and stability." Until the Zoning Board makes a determination on such an application, the status quo will remain in effect,[8] and thus the *456 group will be unable to occupy the premises for which it has signed a lease.[9]

456

19. To the extent that the **Township** of **Cherry Hill** takes the position that **Oxford House** does not meet the definition of a single family under its zoning ordinance, **Oxford House** is precluded from obtaining a C.O. for any single family home in any of the five residential zones in the **Township**. The vast majority of the single family homes in **Cherry Hill** are located in these five residential zones.

20. Other than **Oxford House**, there are no halfway houses, group homes or any other homes in **Cherry Hill** which provide housing for recovering alcoholics and substance abusers. There is no provision in the **Township's** zoning ordinance for halfway houses or group homes.

# D. *The Nature of Alcoholism and Drug Addiction*

21. Addiction to illegal drugs or alcohol places severe limitations on people's lives, disrupting personal relationships, and impairing one's ability to advance in school or employment. These limitations continue to have a significant impact on an alcoholic's or drug addict's life even after the process of recovery has begun.[10] After completion of a rehabilitation program, it is crucial for recovering alcoholics and substance abusers to have a supportive, drug and alcohol-free living environment. The support obtained by being in a group of other recovering addicts substantially increases an individual's chances for recovery.[11]

22. There is a shortage of adequate housing in New Jersey for recovering substance abusers

and alcoholics.[12] Closing *457 down the **Oxford House** at 911 South Kings Highway and forcing the residents to leave would be extremely detrimental to their recovery and would substantially increase the likelihood of relapse.[13]

The above constitutes the court's findings of fact in accordance with Fed. R.Civ.P. 52.

# CONCLUSIONS OF LAW

23. The Third Circuit has held that a district court may issue a preliminary injunction where the following standards are met:

    1) plaintiffs are likely to succeed on the merits;

    2) plaintiffs are subject to irreparable harm *pendente lite;*

    3) defendants will not suffer substantial harm from the grant of an injunction; and

    4) the public interest requires that plaintiffs be accorded relief.

*Sullivan v. City of Pittsburgh*, 811 F.2d 171, 181 (3d Cir.), *cert. denied*, 484 U.S. 849, 108 S.Ct. 148, 98 L.Ed.2d 104 (1987). We will address each of these standards in turn below.

# A. *Likelihood of Success on the Merits*

# 1. *Effect of State Court Ruling*

24. Before we examine the merits of plaintiffs' federal claim, we pause briefly to consider defendant's assertion that we should give "deference" to the findings of the state court in *Township of Cherry Hill v. Oxford House*, No. C-00181-90, slip op. (N.J.Sup.Ct.Ch.Div., April 27, 1992), a case involving the other two **Oxford** Houses in **Cherry Hill**,[14] in which issues similar to those presented here were decided. In that case, the **Township of Cherry Hill** sought to evict the **Oxford House** residents for their failure to comply with the zoning ordinance's definition of a single family. **Oxford House** and its residents argued, *inter alia*, that such enforcement action constituted discrimination on the basis of handicap in violation of the Fair Housing Act. Although the court initially issued an order enjoining the **Township** from any efforts to evict the residents, nearly two years later it issued the ruling cited above, which granted **Cherry Hill's** motion for a preliminary injunction and ordered the residents to vacate the two houses within 60 days.[15] In the course of that ruling, the state court held that the residents of the Pine Valley Road and Hilltop Court **Oxford** Houses did not constitute families under **Cherry Hill's** zoning ordinance, *see id.* at 16, and that they were not "handicapped" within the meaning of the Fair Housing Act, *see id.* at 20. It is these determinations to which defendant urges us to "defer."

458
25. Presumably defendant's argument is based on the doctrines of res judicata and/or collateral estoppel. It is hornbook law, however, that a party in a second lawsuit cannot be bound by a determination *458 of a claim or issue in a previous lawsuit to which she was not a party. *See* 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4406 at 46, and § 4416 at 138 (1981). Since the individual plaintiffs in this action—the current residents of 911 South Kings Highway—were not parties to the state court action, which concerned only the **Oxford** Houses on Pine Valley Lane and Hilltop Court, they clearly cannot be bound by that decision.

26. Secondly, although the organization itself, **Oxford House, Inc.**, is a party to both actions, it is not bound by the state court's holding either. First, we note that the issue of whether **Oxford House** is in violation of the local zoning ordinance is not relevant to the question of federal law before us in this case. *See* United States v. Audubon, 797 F.Supp. 353, 357-58 (D.N.J. 1991). The only question we have been asked to decide is whether **Cherry Hill's** actions

discriminated against plaintiffs on the basis of handicap in violation of the Fair Housing Act. A finding that a Fair Housing Act plaintiff has violated a local zoning ordinance does not preclude a finding of discrimination in violation of the Act. Rather, it is well-established that the Act prohibits discriminatory land use decisions by municipalities, even when such decisions are "ostensibly authorized by local ordinance." *Ardmore, Inc. v. City of Akron*, No. 90-CV-1083, slip op. at 9, 1990 WL 385236 (E.D.Ohio, Aug. 2, 1990); *accord, Oxford House-Evergreen v. City of Plainfield*, 769 **F.Supp.** 1329 (D.N.J.1991) (on motion for preliminary injunction: city's enforcement of zoning ordinance so as to prevent operation of local **Oxford House** in area zoned for single family residences violated Fair Housing Act); *Association of Relatives and Friends of AIDS Patients v. Regulations and Permits Administration*, 740 **F.Supp.** 95 (D.P.R.1990) (government agency's denial of land use permit to open AIDS hospice violated Fair Housing Act); *Baxter v. City of Belleville*, 720 **F.Supp.** 720 (S.D.Ill.1989) (on motion for preliminary injunction: city's refusal to issue special use permit under zoning law to developer wishing to remodel building into residence for persons with AIDS violated Fair Housing Act). *See also* 42 U.S.C. § 3615 ("any law of a State, a political subdivision, or other such jurisdiction that purports to require or permit any action that would be a discriminatory housing practice under this subchapter shall to that extent be invalid [under the Fair Housing Act]"). Therefore, since the issue of **Oxford House's** compliance with the zoning ordinance is not before us in this case, the state court's ruling on that issue is irrelevant.

27. Secondly, we find that the state court's holding with regard to the definition of "handicap" under the Fair Housing Act is also not binding on this court. Although this is a legal issue that is before us in this case, we confront the issue here in the context of a different set of facts. The state court's holding that the residents were not "handicapped" was based on very specific factual findings regarding the particular individuals then residing at the Pine Valley and Hilltop Court **Oxford** Houses. Here we must determine whether a different set of individuals—the residents of 911 South Kings Highway—are "handicapped." Since the instant case presents us with an entirely distinct set of facts, the state court's ruling with regard to handicap is not binding on this court.[16] *See* 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4417 at 148 (collateral estoppel "applies only when the same [factual] issue has been decided in one case and arises in another"). Thus, the state court's decision is not binding with respect to any of the plaintiffs in this action.

## 2. Definition of Handicap

459

28. Plaintiffs rest their claim for relief on the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.*, which was amended in 1988 to prohibit discrimination in housing on the *459 basis of handicap. As amended, the Act defines "handicap" as follows:

> (1) a physical or mental impairment which substantially limits one or more of such person's major life activities,
>
> (2) a record of having such an impairment, or
>
> (3) being regarded as having such an impairment,
>
> but such term does not include current, illegal use of or addiction to a controlled substance.

42 U.S.C. § 3602(h).

29. It is clear that Congress contemplated alcoholism and drug addiction as being among the kinds of "impairments" covered under this definition. First of all, the final clause excluding current users clearly indicates an intent that at least some prior users be covered by the definition. Additionally, the legislative history of the 1988 amendments,[17] as well as the regulations promulgated by the Department of Housing and Urban Development pursuant to the

Act,[18] clearly support this interpretation. Finally, we also note that the definition of handicap in

the Fair Housing Act was taken directly from § 504 of the Rehabilitation Act, 29 U.S.C. § 794,[19] which has consistently been interpreted by the courts to cover alcoholics and drug addicts.[20]

30. Thus, we are confident in saying as a matter of law that alcoholism and drug addiction (excluding current drug use) constitute "impairments" under the Act. What is less clear is whether the second step of the analysis—that is, whether the impairment substantially limits a major life activity—can be satisfied as a matter of law, and thus whether all alcoholics and drug addicts (excluding current users) can be said to be handicapped *per se*, as a matter of law. Under such an analysis, the only factual showing plaintiffs would need to make in order to prove handicap would be that they were alcoholics or drug addicts who were not currently using illegal drugs. Certainly, there are a number of cases interpreting the definition of handicap under the Rehabilitation Act which appear to take this approach. *See, e.g., Sullivan v. City of Pittsburgh,* 811 F.2d 171, 182 (3d Cir.) ("case law establishes that alcoholics are handicapped within the meaning of § 504"), *cert. denied,* 484 U.S. 849, 108 S.Ct. 148, 98 L.Ed.2d 104 (1987); *Rodgers v. Lehman,* 869 F.2d 253, 258 (4th Cir.1989) ("Alcoholism is a handicapping condition within the meaning of the Act"); *Crewe v. U.S. Office of Personnel Management,* 834 F.2d 140, 141-42 (8th Cir.1987) ("there can be little doubt that alcoholism is a handicap for the purposes of the Act"); *Davis v. Bucher,* 451 **F.Supp.** 791, 796 (E.D.Pa.1978) ("persons with histories of drug use, including present participants in methadone maintenance programs, are 'handicapped individuals' within the meaning of the statutory and regulatory language").[21] On the other *460 hand, other cases hold that the question of handicap under the Rehabilitation Act must be a fact-based inquiry to be made on a case by case basis. *See, e.g., Forrisi v. Bowen,* 794 F.2d 931, 933 (4th Cir.1986) (this inquiry "best suited to a 'case-by-case determination' ... as courts assess the effects of various impairments upon varied individuals"); *Perez v. Philadelphia Housing Authority,* 677 **F.Supp.** 357, 360 (E.D.Pa.1987) (same, *quoting* Forrisi), *aff'd,* 841 F.2d 1120 (1988).

31. Here, we will take the more conservative approach, assuming that the second step of the analysis cannot be reached as a matter of law but must rest instead on some specific factual showing that a plaintiff's alcoholism or drug addiction "substantially limits [a] major life activity." Although the record presently before us does not contain such evidence with respect to each individual plaintiff, the expert testimony of Riley Regan with regard to the limitations faced by alcoholics and drug addicts in general, in conjunction with the testimony of one of the current residents of 911 South Kings Highway as to the limitations he suffers, is sufficient at this early stage in the proceedings to meet plaintiffs' present burden of showing a likelihood of success on the merits.

32. This testimony shows that alcoholism and drug addiction place severe limitations on people's lives, including disrupting personal relationships and impairing one's ability to advance in education or employment, and that such limitations do not magically disappear at the moment that abstinence begins, but rather continue to effect a person's functioning at least through the early stages of recovery. It is because of these limitations that recovering drug addicts and alcoholics need to live in a supportive environment of the type that **Oxford House** provides. Many witnesses testified as to the crucial importance of this supportive and drug-free environment in ensuring that a recovering alcoholic or addict does not relapse.

33. These generalized findings are sufficient to demonstrate that plaintiffs are likely to succeed at trial in demonstrating that each individual plaintiff is limited with respect to major life activities, or that residents of **Oxford** Houses in general are by definition so limited. In addition, plaintiffs' evidence shows that all of the residents of 911 South Kings Highway are alcoholics or drug addicts who have completed a rehabilitation program prior to moving into the **house,** and that if they resume the use of alcohol or drugs they will be immediately expelled. We are therefore satisfied that the final prong of the definition of handicap—excluding current users of illegal drugs—is also satisfied. Thus, plaintiffs have met their burden at this stage in the proceedings of demonstrating a likelihood of success on the merits with respect to proving that they are "handicapped" within the meaning of the Act.

## 3. *Discrimination*

34. Under § 804 of the Fair Housing Act it is unlawful

> to discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—

> (A) that buyer or renter,

> (B) a person residing in or intending to reside in that dwelling after it is so sold, rented or made available, or

> (C) any person associated with that buyer or renter.

42 U.S.C. § 3604(f)(1). To prove a violation of § 804, plaintiffs must show either intentional discrimination or a discriminatory impact. See *Doe v. City of Butler*, 892 F.2d 315, 323 (3d Cir.1989); *Oxford House-Evergreen v. City of Plainfield*, 769 F.Supp. 1329, 1343 (D.N.J.1991); *Baxter v. City of Belleville*, 720 F.Supp. 720, 732 (S.D.Ill. *461 1989). Because we find that plaintiffs have demonstrated a likelihood of success on the merits under the disparate impact theory, we need not reach the issue of intentional discrimination.

35. Under the disparate impact theory, the court's analysis is similar to that in Title VII cases. See *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 934 (2d Cir.), aff'd, 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988); *Resident Advisory Board v. Rizzo*, 564 F.2d 126, 148 (3d Cir.1977), cert. denied, 435 U.S. 908, 99 S.Ct. 1457, 1458, 55 L.Ed.2d 499 (1978). Thus, plaintiffs can establish a *prima facie* case by showing that the **Township's** action had a greater adverse impact on a protected group than on others, regardless of intent. See *Huntington*, 844 F.2d at 935. Once plaintiffs establish a *prima facie* case, the burden shifts to the defendant to demonstrate some legitimate, nondiscriminatory reason for their action, and that no less discriminatory alternatives were available. See *Huntington* 844 F.2d at 939; *Rizzo* 564 F.2d at 149.

36. With regard to this analysis, it is important to note that Congress defined "discrimination" as used in § 804 to include "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). The legislative history indicates that Congress borrowed this language from case law interpreting § 504 of the Rehabilitation Act, particularly *Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), and that it intended for those cases to supply the governing standard as to what accommodations are reasonable.[22] In *Davis* the Supreme Court held that an accommodation is unreasonable if it either imposes "undue financial and administrative burdens," *id.* at 412, 99 S.Ct. at 2370, or requires a "fundamental alteration in the nature of a program," *id.* at 410, 99 S.Ct. at 2369. See also *Alexander v. Choate*, 469 U.S. 287, 300 n. 20, 105 S.Ct. 712, 720 n. 20, 83 L.Ed.2d 661 (1985); *Nathanson v. Medical College of Pennsylvania*, 926 F.2d 1368, 1384 (3d Cir.1991). Thus, the courts have applied this same standard in interpreting the reasonable accommodation provision of the Fair Housing Act. See *United States of America v. City of Taylor*, No. 91-CV-73218, slip op. at 13 (E.D.Mich. July 15, 1992) (accommodation reasonable where city would "not have to alter its zoning scheme or incur any undue administrative burdens"); *United States v. Village of Marshall*, 787 F.Supp. 872, 878 (W.D.Wis.1991) (accommodation is unreasonable if it "undermine[s] the basic purpose which the requirement seeks to achieve"); *Oxford House-Evergreen v. City of Plainfield*, 769 F.Supp. 1329, 1344 (D.N.J.1991) (accommodation reasonable where it "would not cause undue financial burden to the City").

37. Here, plaintiffs have established a *prima facie* case of disparate impact by showing that the **Township's** interpretation of the definition of "family" in its zoning ordinance imposes more stringent requirements on groups of unrelated individuals wishing to live together in a rental

property than on individuals related by blood or marriage. Because people who are handicapped by alcoholism or drug abuse are more likely to need a living arrangement such as the one **Oxford House** provides, in which groups of unrelated individuals reside together in residential neighborhoods for mutual support during the recovery process, **Cherry Hill's** application of this ordinance has a disparate impact on such handicapped people.[23]

462

\*462 38. In response, defendant has failed to present evidence establishing a legitimate, nondiscriminatory reason for their action, and that a reasonable accommodation was impossible. Defendant appears to argue that the reason for the denial was the fact that the residents of **Oxford House** do not have the requisite "permanency and stability" to qualify as a family unit under the ordinance. While the New Jersey Supreme Court has held that stability and permanence are legitimate criteria on which to base zoning restrictions in residential neighborhoods, see *Berger v. State,* 71 N.J. 206, 223, 364 A.2d 993 (1976), it has also held that relationship by blood or marriage may not be used as a litmus test for such qualities. Rather, "the standard ... must be functional, and hence capable of being met by either related or unrelated persons." *Borough of Glassboro v. Vallorosi,* 117 N.J. 421, 431, 568 A.2d 888 (1990) *(citing Berger,* 71 N.J. at 225-27, 364 A.2d 993). Here the record establishes that just such a litmus test is employed by the **Township** of **Cherry Hill** in issuing C.O.'s. Groups related by blood or marriage are automatically issued C.O.'s without any further inquiry into permanency or stability, while unrelated groups are automatically denied C.O.'s and forced to appeal their case by way of an application to the Zoning Board for a variance, which requires the group to prove its permanency and stability in a public hearing. We find that plaintiffs were denied a C.O. on the basis of their status as unrelated persons and that under the New Jersey Supreme Court's opinion in *Vallorosi* that cannot constitute a legitimate reason for the denial.[24]

39. Further, we hold that defendant did not meet its burden of establishing that no less restrictive alternative was available or that no reasonable accommodation could be made.[25] Indeed, the evidence indicates that accommodating plaintiffs by waiving the single family requirement and granting them a C.O. would impose no administrative or financial burdens on the **Township** whatsoever, and would not effect a fundamental change in the nature of the neighborhood. See *Davis,* 442 U.S. at 410, 412, 99 S.Ct. at 2369, 2370. Defendant offered no evidence that such an accommodation would significantly compromise the **Township's** legitimate interests in the residential character of the surrounding neighborhood. On the contrary, the evidence shows that 911 South Kings Highway is surrounded by offices, apartment buildings and duplexes. If anything, it seems that permitting its use by **Oxford House** as a residence would enhance rather than detract from the residential character of the neighborhood. Additionally, the record contains uncontroverted testimony that there have been no complaints from neighbors with regard to the use of the premises at 911 South Kings Highway. Nor is there any evidence that the presence of any of the three **Oxford Houses** in **Cherry Hill** has had any adverse impact on the surrounding neighborhoods.

463

40. In short, we are hard-pressed to find any evidence in this record as to how such an accommodation would impact negatively in any way upon the **Township** of \*463 **Cherry Hill** or the public in general.[26] Therefore, the record indicates that by refusing to grant plaintiffs a C.O., the **Township** has failed to make a reasonable accommodation. See *United States of America v. City of Taylor,* No. 91-CV-73218, slip op. at 12 (E.D.Mich. July 15, 1992) (municipality's refusal to grant zoning approval for group home for twelve elderly disabled people in single family residential zone violated reasonable accommodation provision of Fair Housing Act); *Oxford House-Evergreen v. City of Plainfield,* 769 **F.Supp.** 1329, 1344 (D.N.J.1991) (on preliminary injunction motion, municipality's refusal to grant zoning approval for **Oxford House** in single family zone showed violation of Fair Housing Act). This, in conjunction with plaintiffs showing of disparate impact, is sufficient to demonstrate a likelihood of success in proving that the **Township's** actions violated the Fair Housing Act.[27]

# B. *Irreparable Injury*

41. We note at the outset that the 11th Circuit has taken the position that a showing of a substantial likelihood that a defendant has violated the Fair Housing Act is itself sufficient to create a presumption of irreparable harm, which shifts the burden to defendant to prove that any injury that may occur is not irreparable. See Gresham v. Windrush Partners, Ltd., 730 F.2d 1417, 1423-24 (11th Cir.1984), cert. denied, 469 U.S. 882, 105 S.Ct. 249, 83 L.Ed.2d 187 (1984); see also Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 803 (3d Cir.1989); Gov't of Virgin Islands Dep't of Conservation & Cultural Affairs v. Virgin Islands Paving, Inc., 714 F.2d 283, 286 (3d Cir.1983). Here, however, even if we place the initial burden on plaintiffs, we find that this second prong of the preliminary injunction standard has been met.

42. Plaintiffs have presented evidence demonstrating that the ability of recovering alcoholics and drug addicts to live in a supportive drug free environment in a quiet residential area is critical to their recovery. Plaintiffs' expert witness, Riley Regan, testified that an addict's or alcoholic's chances of recovery are enhanced fivefold by living in a drug and alcohol-free environment. Additionally, the record is replete with testimony from individual drug addicts and alcoholics as well as professionals in the field, who all agree that **Oxford House** provides a supportive environment that is critical to the continued recovery of its residents and that shutting down the **house** at 911 South Kings Highway would result in a high likelihood of relapse for its residents.

43. This Circuit has already held that an action that jeopardizes the recovery process for a group of alcoholics and threatens to push them into relapse causes just the kind of irreparable harm that justifies preliminary injunctive relief. In Sullivan v. City of Pittsburgh, 811 F.2d 171, 179-80 (3d Cir.), cert. denied, 484 U.S. 849, 108 S.Ct. 148, 98 L.Ed.2d 104 (1987), the circuit court observed:

> plaintiff-appellees are primarily recovering alcoholics who are in a critical stage of their recovery.... Without proper care, supervision and peer support each could easily suffer a relapse.... For these alcoholics, a relapse threatens not *464 only a potentially irremediable reversion to chronic alcohol abuse but immediate physical harm or death. The record reflects that alcoholics who had been denied treatment at the Center were unable to end their alcohol abuse and suffered severe injury or death as a result ... and it is clear that [the centers' managers] provide[ ] the only treatment available for appellees.... Indeed, it is difficult to conceive of many facts which would more compellingly argue for appellees' relief.

Here too we find that the uncontroverted evidence showing that a failure to issue an injunction will substantially increase the likelihood of relapse for the current residents of 911 South Kings Highway constitutes a sufficient showing of irreparable harm.

44. Defendant argues that it is premature to make a finding that plaintiffs will suffer irreparable harm by the denial of a C.O. because the **Township** has not yet made a final determination that a C.O. will be denied. Thus, at this juncture, the **Township** argues, it is simply asking plaintiffs to apply to the **Cherry Hill** Zoning Board for an interpretation or a variance, and since plaintiffs will not suffer any irreparable harm by making such an application, they must be required to exhaust this administrative remedy before coming to this court for relief.

45. We are not persuaded by this argument. The record indicates that an appeal to the Zoning Board takes time[28]—involving, among other things, a public hearing— and that during the pendency of such a proceeding, plaintiffs would not be able to occupy the **house**. Since **Oxford House** relies on residents of its houses to pay the rent, it would have no way of meeting its obligations under its lease of 911 South Kings Highway during the pendency of the zoning proceeding, and would therefore presumably lose the lease. Indeed, there was testimony at the hearing that the landlord immediately sought to return the security deposit and cancel the lease upon learning of the **Township's** initial refusal to issue the C.O. last March.

Presumably, had **Oxford House** appealed the denial of the C.O. to the Zoning Board, as defendant suggests, rather than seeking the immediate intervention of this court, the lease

would have been canceled before a determination was ever reached by the Zoning Board. Moreover, even assuming that **Oxford House** could somehow keep the lease, our findings indicate that a delay of even a few weeks in allowing the individual plaintiffs to move into the **Oxford House** would increase their chances of relapse and thus would be likely to cause irreparable injury.[29]

46. Therefore, regardless of the ultimate outcome of a proceeding before the Zoning Board, we find that the delay involved would cause plaintiffs to suffer irreparable harm. Therefore they are not required to exhaust such procedures before obtaining relief from this court. *See Easter Seal,* 798 **F.Supp.** at 235-36 (citing *American Fed'n of Gov't Employees v. Resor,* 442 F.2d 993, 995 (3d Cir.1971)).[30] Accordingly, we find that plaintiffs will *465 suffer irreparable harm if an injunction is not granted. They have therefore met the second prong of the preliminary injunction standard.

465

## C. *Harm to Defendant*

47. As noted above in our discussion of the Fair Housing Act's reasonable accommodation requirement, we search the record in vain for any showing by the defendant as to how the granting of the requested injunction will harm the defendant. Any threat to the residential character of the neighborhood is minimal at most and is overwhelmingly outweighed by the potential for harm to the individual plaintiffs if the injunction is denied and they are forced to leave **Oxford House.**

## D. *Public Interest*

48. Through its enactment of the Fair Housing Amendments of 1988 and the Federal Anti-Drug Abuse Act of 1988, Congress has expressed a strong public policy favoring an end to discrimination in housing on the basis of handicap and favoring the establishment of housing programs for recovering drug addicts and alcoholics. Indeed, the Anti-Drug Abuse Act's provision encouraging the establishment of revolving loan funds by states to make startup loans to help establish group homes for recovering drug addicts and alcoholics was based specifically on the model of **Oxford House.** *See* 134 Cong.Rec. E 3732 (daily ed. Nov. 10, 1988) (remarks of Rep. Madigan). Thus, Congress has directly endorsed **Oxford House** itself as an organization worthy of public support because of its role in helping to stem the national epidemic of alcohol and drug abuse. This public policy is further reflected in enactments of the New Jersey Legislature supporting programs that assist recovering alcoholics and substance abusers. *See* N.J.S.A. 26:2B-1 *et seq.*

49. Viewing these clear expressions of legislative support for the goal of reducing drug addiction and alcoholism against the backdrop of the current atmosphere of overwhelming public concern over the impact of drugs on our society, as reflected by the much publicized federally-declared "war on drugs," we would be hard-pressed to deny the significance of the public interest in supporting efforts like **Oxford House** to assist in and encourage the recovery of alcoholics and drug addicts. *See Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 803 (3d Cir.1989) (legislative expressions of public policy through statutes may be relied on to define "public interest" for purposes of preliminary injunction analysis). Accordingly, we hold that the public interest factor weighs heavily in favor of the issuance of a preliminary injunction in this case.

The above constitutes the court's conclusions of law in accordance with Fed. R.Civ.P. 52.

## CONCLUSION

Therefore, based on the foregoing findings of fact and conclusions of law, we find that all four preliminary injunction standards have been satisfied, and we therefore find sufficient grounds for

the issuance of a preliminary injunction, enjoining the **Township of Cherry Hill** from interfering with the occupancy of the single family **house** at 911 South Kings Highway by **Oxford House, Inc.** and John Does One through Seven.

[1] The original **Oxford House** was founded in 1975 in Montgomery County, Maryland by a group of individuals who were recovering from alcohol or drug addiction. When the County decided to close the halfway **house** in which they had been living because of lack of funds, the group rented the **house** themselves. Resentful of the way the halfway **house** had been run, they sought to operate **Oxford House** differently: no staff was present at the **house**; a resident could stay as long as he worked, remained drug and alcohol free, and paid his share of the expenses; and the **house** was democratically self-governed.

[2] These provisions of the federal law are based upon the national experience of **Oxford House**, which served as a model for the "self-run and self-supported recovery housing envisioned by Congress." 134 Cong.Rec. E 3732 (Daily Ed. Nov. 10, 1988) (Remarks of Rep. Madigan).

[3] The C.O. requirement applies only to rentals and not sales of single family homes.

[4] At the time the decision was made on March 11, 1992 to deny **Oxford House** a C.O., no one from **Cherry Hill** had contacted **Oxford House** or had any information about the background or the identity of the prospective tenants at 911 South Kings Highway. There is nothing in the application for a C.O. which inquires into the background of the proposed tenants nor is this information ordinarily obtained in connection with a C.O. application.

[5] At the preliminary injunction hearing, the **Township** took the position that the C.O. was originally denied because of property maintenance code violations, as well as its violation of the zoning ordinance. Mr. Rosen testified on direct examination that he observed numerous code violations during his inspection of March 11th, and that he informed Mr. Ragozine of these violations. The **Township** does not dispute that any property maintenance code violations that did exist were cured by March 30, 1992, when the C.O. was finally issued pursuant to this court's order. Thus, it is clear that, at this juncture, the **Township's** ongoing opposition to plaintiffs' occupancy of the **house** is based solely on its position that the residents do not constitute a family under the zoning ordinance.

The dispute as to the code violations existing on March 11th, therefore, relates only to the question of what was the original basis for the **Township's** denial of the C.O. We believe that the most persuasive evidence on this question is the letter of March 11th to Realco Management from the **Township's** attorney. As noted above, the only basis for the denial of the C.O. set forth in that letter was the failure to comply with the zoning ordinance's "single family" requirement. Had there been an additional reason for the denial, we believe that it would have been stated in the letter. Since no additional reason was stated, we are persuaded that the sole reason for the **Township's** original denial of the C.O., as well as its ongoing opposition to plaintiffs' occupancy of 911 South King's Highway, is the **Township's** view that plaintiffs do not constitute a "family" under the zoning ordinance.

[6] *See infra* ¶ 24.

[7] Although Mr. Ragozine objected to the term "automatic" in this context and insisted that the initial determination as to whether a group constitutes a "family" is made on a "case-by-case" basis, we were unpersuaded by his apparent attempts to obfuscate the rigid and inflexible nature of his agency's decision-making process. Plaintiffs' counsel effectively impeached Mr. Ragozine's attempt to back away from earlier deposition testimony in which he clearly stated that a group of individuals not related by blood or marriage could never constitute a "family" in his view. Moreover, Mr. Ragozine admitted that he could not think of a single instance in which a C.O. had been denied to a group of people related by blood or marriage on the basis of their failure to meet the definition of family or the "permanency or stability" standard. Nor, indeed, could he think of an instance in which any formal determination with regard to such a group's compliance with these standards was made.

[8] Under state law, an appeal to the Zoning Board automatically preserves the status quo except in extraordinary situations where that would "cause imminent peril to life or property." N.J.S.A. 40:55D-75.

[9] The **Township's** initial denial of a C.O. for **Oxford House's** occupancy of 911 South King's Highway has not been appealed to the Zoning Board. *See infra* ¶¶ 44-45.

[10] Riley Regan, executive director of the Governor's Council on Alcoholism and Drug Abuse for the State of New Jersey, is himself a recovering alcoholic who has worked in the field of alcoholism and drug abuse for over 25 years and has extensive experience, training, education, and specialized knowledge in this field. We therefore find him to be an expert witness pursuant to Fed.R.Evid. 702. Mr. Regan testified at trial that even after completing a rehabilitation program, alcoholics and drug addicts face major limitations and "tremendous hurdles" in their lives. "Recovery is a very tenuous thing;" and unless recovering addicts and alcoholics are very careful to follow a "rigid regime" of attending support groups like Alcoholics Anonymous, and avoiding associations with people who may encourage them to drink or use drugs, they can easily fall back into relapse. Regan emphasized that the people who may pose the biggest threat to an individual's recovery are not necessarily other addicts or alcoholics, but rather, "people in the mainstream, people that mean well who take you to a ball game and say

alcoholics, but rather, people in the mainstream, people that mean well who take you to a ball game and who say come fishing with me and can't understand that you can't have a beer."

Additionally, one of the current residents of the **Oxford House** at 911 South Kings Highway, A.R., testified that alcoholism has "taken over [his] life" and is "the reason [he] cannot hold a job [or] relationships."

[11] Mr. Regan testified that "the key ingredient in recovering from drug addiction and alcoholism [and] being integrated back into the community ... is the group support," and that an individual's chances of recovery are increased fivefold by living in a clean, stable drug and alcohol-free environment. Steve Polin, **Oxford House** Inc.'s Director of Community Affairs, who is himself a recovering addict and former **Oxford House** resident, testified that

there is a certain amount of emotional bonding and support that one can only get from living or associating with other recovering addicts and alcoholics. In Narcotics Anonymous, it's said that the therapy value of one addict helping another is without parallel. And this is ... seen on a daily basis in **Oxford House**.

Joan Treske, the Program Coordinator for a treatment program for substance abusers and mentally ill persons in **Cherry Hill**, who has worked with alcoholics and drug addicts for 12 years, testified that living in a supportive environment is particularly important for people who are in the early stages of recovery. With regard to one of her clients who is a current resident of 911 South Kings Highway, she said that living in **Oxford House** has made "the difference of night and day" for him.

It has made an enormous difference for this particular individual to be living in a community where not only drugs are not available but he is required to be part of a smaller household community where he has really [been] required to ... pull his weight.

[12] Mr. Regan testified that the lack of adequate housing in a drug and alcohol-free environment is a "major, major problem." He stated that for alcoholics and drug addicts, finding adequate housing in a drug and alcohol-free neighborhood after a rehabilitation program is more difficult than getting into the rehabilitation program itself.

Mary Long, an aftercare counselor at an inpatient treatment program for alcoholism and drug addiction located in Williamstown, New Jersey, testified that it has been so difficult to find suitable housing for recovering alcoholics who have completed the program, that she has been forced to place clients in Pennsylvania.

[13] Joan Treske testified that if the **Oxford House** at 911 South Kings Highway were closed, her client who currently resides there "would return to [his] communit[y] of origin and would be highly susceptible to returning to a life of addiction and alcoholism." Similarly, John Seeland, himself a recovering addict who has worked for **Oxford House** for three years and helped to set up the **house** at 911 South Kings Highway, testified that "[i]f people go back to where they came from, they will act the way they acted before they left, which was to use."

Riley Regan testified that if communities like **Cherry Hill** were able to shut down **Oxford** Houses, "it would be a major disaster for our field." Finally, one current resident of 911 South Kings Highway, when asked what would happen if he were forced to leave, testified: "At this time? It scares me. I don't know where I'd go or what I'd do, you know. I have no plans. I don't know what I'd do right now."

[14] These other **Oxford** Houses are located at 141 Pine Valley Road and 108 Hilltop Court.

[15] The residents have not been forced to vacate thus far, because on May 29, 1992, the Appellate Division granted **Oxford House's** motion for interlocutory review and stayed the lower court's preliminary injunction pending the appeal.

[16] Nor do we feel compelled to treat as persuasive precedent the decision of a state court with respect to an issue of federal law.

[17] The **House** Report states:

[I]individuals who have a record of drug use or addiction but who are not currently using illegal drugs would continue to be protected if they fell under the definition of handicap.... Just like any other person with a disability, such as cancer or tuberculosis, former drug-dependent persons do not pose a threat to a dwelling or its inhabitants simply on the basis of status. Depriving such individuals of housing, or evicting them, would constitute irrational discrimination that may seriously jeopardize their continued recovery.

H.R.Rep. No. 711, 100th Cong., 2d Sess. 22 (1988), *reprinted in* 1988 U.S.Code Cong. & Admin.News 2173, 2183.

[18] The regulations state that:

The term physical or mental impairment includes, but is not limited to, such diseases and conditions as ... drug addiction (other than addiction caused by current, illegal use of a controlled substance) and alcoholism. 24 CFR § 100.201(a)(2).

[19] The **House** Report accompanying the Fair Housing Act stated, "[t]he Committee intends that the definition be

interpreted consistent with regulations clarifying the meaning of the similar provision found in section 504 of the Rehabilitation Act." H.R.Rep. No. 711, 100th Cong., 2d Sess. 22 (1988), *reprinted in* 1988 U.S.Code Cong. & Admin.News 2173, 2183.

[20] *See, e.g.,* Sullivan v. City of Pittsburgh, 811 F.2d 171, 182 (3d Cir.), *cert. denied,* 484 U.S. 849, 108 S.Ct. 148, 98 L.Ed.2d 104 (1987); Simpson v. Reynolds Metals Co., Inc., 629 F.2d 1226, 1231 n. 8 (7th Cir.1980).

[21] See also United States v. Southern Management Corp., 955 F.2d 914, 918 (4th Cir.1992), for a bootstrap argument with regard to this issue under the Fair Housing Act. There the court essentially used its finding of discrimination to prove handicap. Finding that plaintiffs had been denied housing on the basis of their status as drug addicts and alcoholics, the court reasoned that their inability to obtain housing (a major life activity) due to the attitudes of others, therefore qualified them as handicapped under the third prong of the definition ("being regarded as having such an impairment").

[22] *See* H.R.Rep. No. 711, 100th Cong., 2d Sess. 25 (1988), *reprinted in,* 1988 U.S.Code Cong. & Admin.News 2173, 2186.

[23] We note here that a showing of disparate impact does not require any showing of intent or animus. Therefore, while we have no finding as to intent on the present record, even if we were to assume that **Cherry Hill's** zoning enforcement was undertaken for a facially neutral reason having nothing to do with plaintiffs' status as recovering drug addicts and alcoholics, plaintiffs' *prima facie* showing of a violation of the Act through disparate impact would remain intact.

[24] We wish to make clear that we have not been presented with a constitutional challenge to **Cherry Hill's** zoning ordinance and we do not make any holding with respect to the constitutionality of the ordinance. We examine **Cherry Hill's** application of the ordinance in light of constitutional norms as enunciated by the New Jersey Supreme Court only as a means for determining whether there is a legitimate reason for **Cherry Hill's** disparate treatment of plaintiffs under the ordinance which would shield the **township** from plaintiffs' discrimination claim under the Fair Housing Act.

[25] As an initial matter, we reject defendant's contention that requiring plaintiffs to apply to the Zoning Board for an interpretation or variance constitutes a reasonable accommodation on the part of the **Township**. "Reasonable accommodation" means changing some rule that is generally applicable to everyone so as to make its burden less onerous on the handicapped individual. Thus, where everyone is provided with "equal access" to a building in the form of a staircase, reasonable accommodation to those in wheelchairs may require building a ramp. Here, defendant's suggestion that making the process of applying for a C.O. *more* onerous for plaintiffs than it is for the majority of applicants, somehow constitutes a "reasonable accommodation," stands the concept on its head. It is analogous to arguing that a rule requiring only handicapped people to pay a special fee before entering a building constitutes a reasonable accommodation.

[26] There is an oblique reference in the record to "citizen opposition" to the two **Oxford** Houses at 141 Pine Valley Road and 108 Hilltop Court, but the record contains no elaboration as to the nature of that opposition. Nor is there any indication that any such opposition has been voiced with respect to the **Oxford House** at issue here. In any case, the fact that citizens may vociferously oppose the establishment of a home for handicapped people in their neighborhood can hardly be cited as a legitimate justification for discriminatory treatment of the handicapped. As the Supreme Court has warned, "[p]rivate biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." Palmore v. Sidoti, 466 U.S. 429, 433, 104 S.Ct. 1879, 1882, 80 L.Ed.2d 421 (1984).

[27] Plaintiffs may also be able to succeed in proving intentional discrimination in violation of § 804, 42 U.S.C. § 3604(f)(1) and/or interference with the exercise of rights under the Act in violation of § 818, 42 U.S.C. § 3617, both of which have also been alleged. Because we find a likelihood of success under the disparate impact/reasonable accommodation analysis, however, we need not reach these alternative claims at this juncture.

[28] Under state law, a zoning board has 120 days after an appeal is filed to render a decision. *See* N.J.S.A. 40:55D-73.

[29] We also note that plaintiffs would probably have difficulty presenting their case to the Zoning Board because individual residents or potential residents would, for obvious reasons, wish to remain anonymous and therefore would be hesitant to testify in a public hearing. To that extent, it may be that pursuit of such an avenue by plaintiffs would either cause harm to plaintiffs by forcing them to identify themselves publicly as addicts, and/or amount to an "exercise in futility." The Easter Seal Society of New Jersey v. Township of North Bergen, 798 F.Supp. 228, 236 (D.N.J.1992) (where "[a]ny further efforts ... to work within the municipal administrative apparatus would be an exercise in futility," exhaustion is not required) (citing Doe v. Butler, 892 F.2d 315, 322 (3d Cir.1989)).

[30] It is also worth noting that the issue that the **Township** wishes to see resolved by the Zoning Board—whether plaintiffs meet the definition of "family" in the ordinance—is irrelevant to our determination here under the Fair Housing Act. *See supra* ¶ 26. Indeed, our finding that a Zoning Board proceeding is likely to cause irreparable

injury to plaintiffs, also constitutes a basis for our holding that the **Township** has violated the Fair Housing Act by imposing more onerous procedural requirements on plaintiffs than are imposed on others and by failing to make a reasonable accommodation. Thus, it is the enforcement of the zoning ordinance itself, including the **Township's** position that plaintiffs must go before the Board, that constitutes a violation of the Act. To require plaintiffs to "exhaust" those procedures that themselves violate the Act before seeking the protection of the Act in federal court would be nonsensical at best.

About Google Scholar - All About Google - My Citations

©2012 Google



Home | Featured Decisions | Leagle EyeViews | Proposed Regulations | Statutes | Leagle Kontact | Search | About Us

View Case   Cited Cases   Citing Cases   Comment (0)

Like | Follow Leagle on Twitter

Millions of cases at your finger

Your Search Res

## OXFORD HOUSE, INC. v. TOWN OF BABYLON

### 819 F.Supp. 1179 (1993)

OXFORD HOUSE, INC., Jeff G., Eugene T., Ernest S., Gary B., Robert R., John R., Gary and Geri Erichson, Plaintiffs,

v.

TOWN OF BABYLON, Defendant.

No. CV 91-3591.

United States District Court, E.D. New York.

April 28, 1993.

Stein & Schonfeld by Robert L. Schonfeld, Garden City, NY, for plaintiffs.

Mental Health Law Project by Beth Pepper, Washington, DC, co-counsel for plaintiffs.

Martin, Fallon & Mulle by Richard C. Mulle, Huntington, NY, for defendant.

James P. Turner, Acting Asst. Atty. Gen. by Myron S. Lehtman, Dept. of Justice, Washington, DC, for U.S. as amicus curiae.

### AMENDED ORDER

WEXLER, District Judge.

Pursuant to the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* ("FHA"), Oxford House, Inc. ("Oxford House") and Gary and

[ 819 F.Supp. 1181 ]

Geri Erichson ("the Erichsons"), plaintiffs in the above referenced action, seek to enjoin the Town of Babylon ("Town" or "defendant") from evicting persons with handicaps (also referred to as "plaintiffs") from their residence at 73 East Walnut Avenue, East Farmingdale, New York.[1] Now before the Court is plaintiffs' motion for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on the ground that the Town violated the Fair Housing Act because its proposed eviction of plaintiffs has a disparate impact on persons with handicaps; or, in the alternative, because the Town failed to make reasonable

accommodations in its zoning ordinances as may have been necessary to afford plaintiffs an equal opportunity to enjoy housing in the Town. For the reasons discussed below, plaintiffs' motion for partial summary judgment is granted.

## I. BACKGROUND

Oxford House was founded in 1975 by a group of men who were recovering from drug and/or alcohol addiction. Today there are 375 individual "Oxford Houses" which are operated on the same premise as the original. Three basic rules guide the functioning of all Oxford Houses: (1) they must be democratically self-governed; (2) they must be financially self-supporting; and (3) any person using drugs or alcohol must be immediately expelled. There are no health care professionals on the premises, and an individual can stay as long as he wishes so long as he remains drug and alcohol free and pays his share of the expenses.

Expressly based on the Oxford House concept, the Anti-Drug Abuse Act of 1988, 42 U.S.C. § 300x et seq., mandates that each state establish and implement a revolving fund to foster the creation of self-run, self-supported recovery houses throughout the country. In order to qualify for a loan, applicants must adhere to the three requirements set forth in the Oxford House rules as stated above.

Pursuant to the Anti-Drug Abuse Act, the State of New York entered into a contract with Oxford House to provide it with a loan fund for the creation of recovery homes in New York. On or about August 30, 1991, Oxford House used $4,000 from this fund for the establishment of a home at 73 East Walnut Avenue, East Farmingdale, New York ("East Farmingdale Oxford House"). The house is owned by the Erichsons, and is located in a residential district in the Town, which is zoned for single family dwellings only.[2]

Shortly after the lease was signed, neighbors complained to Town officials that recovering alcoholics were living in their community. On September 3, 1991, a Town meeting was held to discuss the new residents. This was followed by a letter from the Town Attorney to the representatives of Oxford House, alleging that the house in East Farmingdale was in violation of the Multiple Dwelling Code because the residents were not a family.[3] On or about September 6, 1991, Oxford House requested that the Town make a reasonable accommodation in the application of its zoning ordinance so that the residents could continue living there. The Town has never responded.

On or about September 17, 1991, the Town Board authorized the Town attorney to commence appropriate litigation, including injunctive relief and contempt proceedings, to evict the residents of the East Farmingdale Oxford House. That same day, plaintiffs filed this action to enjoin the Town from carrying out its resolution.

[ 819 F.Supp. 1182 ]

On February 2, 1992, the Town filed suit in state court against plaintiffs seeking to evict the residents of the East Farmingdale Oxford House.[4] On or about May 12, 1992, the state court action was removed to this Court and consolidated with plaintiffs' action.

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of establishing the absence of any genuine issue of material fact. Celotex Corp. v. Catrett,477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); Thompson v. Gjivoje,896 F.2d 716, 720 (2d Cir.1990). All reasonable inferences and ambiguities are drawn in favor of the nonmoving party. Anderson v. Liberty Lobby, Inc.,477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); Thompson, 896 F.2d at 720 (citing United States v. Diebold, Inc.,369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1961) (per curiam)).

### B. Overview of the Fair Housing Act

Under the FHA, it is unlawful to discriminate in the sale or rental, or to otherwise make unavailable or deny a dwelling to any buyer or renter because of a handicap. 42 U.S.C. § 3604(f)(1). A person is handicapped if he or she has a mental or physical impairment. 42 U.S.C. § 3602(h). It is well established that individuals recovering from drug or alcohol addiction are handicapped under the FHA. United States v. Southern Management Corp.,955 F.2d 914, 917-23 (4th Cir.1992); Elliott v. City of Athens,960 F.2d 975, 977 n. 2

(11th Cir.1992), *cert. denied*, ___ U.S. ___, 113 S.Ct. 376, 121 L.Ed.2d 287 (1972); *Oxford House, Inc. v. Township of Cherry Hill*, 799 F.Supp. 450, 458-60 (D.N.J.1992); *United States v. Borough of Audubon, NJ*, 797 F.Supp. 353, 358-59 (D.N.J.1991). A plaintiff can establish a violation under the FHA by proving the disparate impact of a practice or policy on a particular group,[5] *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 933 (2d Cir.), *aff'd*, 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988), or by showing that the defendant failed to make reasonable accommodations in rules, policies, or practices so as to afford people with disabilities an equal opportunity to live in a dwelling. 42 U.S.C. § 3604(f)(3)(B). Once an FHA violation is established, the plaintiff is entitled to injunctive relief. *Southern Management Corp.*, 955 F.2d at 923.

C. *Plaintiff's Claim that the Town's Zoning Ordinance Has a Disparate Impact on People with Handicaps*

To establish a *prima facie* case under the disparate impact analysis, a plaintiff must prove that the challenged practice "actually or predictably" results in discrimination. *Huntington Branch, NAACP*, 844 F.2d at 933. Once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to prove that "its actions furthered, in theory and in practice, a legitimate, bona fide governmental interest and that no alternative would serve the interest with less discriminatory effect." *Id.* at 936 (citing *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 148-49 (3d Cir.1977), *cert. denied*, 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978).

[ 819 F.Supp. 1183 ]

In the end, the court must balance the plaintiff's showing of discriminatory impact against the defendant's justifications for its conduct. *Huntington Branch, NAACP*, 844 F.2d at 936. When conducting this balance, two factors weigh heavily in the plaintiffs' favor: (1) evidence of discriminatory intent on the part of the defendant; and (2) evidence that the plaintiff is seeking only to require a municipal defendant to eliminate an obstacle to housing rather than suing to compel it to build. *Id.* (citing *Metropolitan Hous. Dev. Corp. v. Arlington Heights*, 558 F.2d 1283, 1290 (7th Cir.1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978)).

Plaintiffs in the present case have set forth evidence to establish that the Town's proposed eviction actually or predictably results in discrimination. The Town asserts that the Oxford House facility is not permitted at 73 East Walnut Avenue because the residents are not a "family" or the "functional and factual equivalent of a natural family." Under § 213-1 of the Town Code, a "family" is a group of persons related by "kinship, adoption, blood or marriage." The "functional and factual equivalent of a natural family" is defined as a "single housekeeping unit" bearing the same characteristics as a biological family, including a stable non-transient existence. The Town maintains that because plaintiffs are transients, they do not function as a family unit, and can therefore be evicted pursuant to the Town Code.

Applying § 213-1 of the Town Code to evict plaintiffs would discriminate against them because of their handicap. Recovering alcoholics or drug addicts require a group living arrangement in a residential neighborhood for psychological and emotional support during the recovery process.[6] As a result, residents of an Oxford House are more likely than those without handicaps to live with unrelated individuals. Moreover, because residents of an Oxford House may leave at any time due to relapse or any other reason, they cannot predict the length of their stay. Therefore, a finding of a violation of the Town Code leading to the town's eviction of plaintiffs from a dwelling due to the size or transient nature of plaintiffs' group living arrangement actually or predictably results in discrimination.

Once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to prove that its actions furthered a legitimate governmental interest and that there were no less discriminatory alternatives. *Huntington Branch, NAACP*, 844 F.2d at 936. Defendant in the present case asserts that the ordinance is designed to keep boarding houses, rooming houses, multiple family dwellings, and other similar arrangements out of residential neighborhoods. The Town contends that it enforces the ordinance against all violators; the enforcement of the ordinance furthers a legitimate governmental interest in maintaining the residential character of the areas zoned for single family dwellings; and any discriminatory effect it may have on plaintiffs is due to plaintiffs' transiency and failure to live as a family, not because of their handicap.

Although a town's interest in zoning requirements is substantial, *see Village of Belle Terre v. Boraas*, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974), the Court finds that evicting plaintiffs from the East Farmingdale Oxford House is not in furtherance of that

interest. Five Town officials testified that the Town has received no substantial complaints from plaintiffs' neighbors within the past year. Furthermore, the house is well maintained and does not in any way burden the Town or alter the residential character of the neighborhood. The presence of the East Farmingdale Oxford House in a single family, residential district does not undermine the purpose of the Town's zoning ordinance. Therefore, defendant cannot justify evicting

[ 819 F.Supp. 1184 ]

plaintiffs as being in furtherance of its asserted governmental interest.[7]

Even if the Town's proposed enforcement of its zoning ordinance advances a legitimate governmental interest, the Court nevertheless finds that plaintiffs' showing of discriminatory effect far outweighs the Town's weak justifications. Although the plaintiff is not required to prove discriminatory intent in order to show discriminatory effect, in balancing disparate impact against a governmental interest, evidence of such intent weighs heavily in the plaintiff's favor. *Huntington Branch NAACP*, 844 F.2d at 936. Plaintiffs in the present case have set forth substantial evidence to indicate that the Town had the intent to evict them because they were recovering alcoholics.

On September 3, 1991, a public meeting was held to discuss the East Farmingdale Oxford House. So many neighbors came to the meeting that Supervisor Pitts suspended the normal rules. (Excerpts from Regular Town Board Meeting of September 3, 1991, p. 1 (hereafter "Town Board Meeting")). These neighbors were "hostile" to it, (Deposition of Supervisor Pitts, p. 12), expressing their fears regarding the safety of children and senior citizens.[8] (Town Board Meeting, pp. 1, 3-5). No one from the community or the Town Board spoke in favor of the East Farmingdale Oxford House. (Plaintiffs' Exhibit B, p. 30).

The citizens of East Farmingdale made it clear that they did not want recovering individuals living in their neighborhood. One individual stated, "I don't want [my son] subjected to irrational, unpredicted [sic] behavior from people." (Town Board Meeting, p. 5). Another demanded, "[w]hat [can you] do to help us remove this threat from our community[?]" (Town Board Meeting, p. 5). In response to their concerns, Supervisor Pitts made the following statements:

> Merely not wanting to have someone there doesn't necessarily mean that we can stop them, but what it does mean is that there are all kinds of laws about single room occupancy, occupancy limitations in the town, motel/hotel in the town.

(Town Board Meeting, p. 2).

> I don't want to sit up here and say we can keep them out, because we've had other instances with group homes in the town where we have been unable to keep group homes out of the town.

(Town Board Meeting, p. 6).

> If it is coming under the laws of the State of New York, we're going to have a real hard time because it's a fight we fought before, and it's a fight we've unfortunately lost before.

(Town Board Meeting, p. 7).

A Town of Babylon councilman also spoke at the Town meeting, stating,

> So I wish I could say absolutely, we'll keep them out. But we're not an army. I mean if they move in tomorrow, we can't go in there and yank them out of their beds either. I'd like to say that....

(Town Board Meeting, p. 8).

After the Town meeting, the Town attorney sent a letter to Oxford House asserting that plaintiffs did not comport with the definition of a "family" in the Multiple Dwelling Code. (Plaintiffs' Exhibit G). Next, the Town alleged that the East Farmingdale Oxford House violated the Town Code because it was a "boarding house or the house of transients." (Resolution No. 716, Plaintiffs' Exhibit A). The Town presently contends

[ 819 F.Supp. 1185 ]

that plaintiffs are in violation of the Town Code because they are not a "family" or the "functional and factual equivalent of a natural family." The statements made at the Town Board meeting, in conjunction with the shifting bases for eviction asserted by the Town, indicates that the Town wants to evict plaintiffs because they are recovering alcoholics.

Furthermore, in *Huntington Branch, NAACP*, the court held that where the plaintiff was not suing to require the municipal defendant to build housing, but rather to remove an obstacle to housing, the defendant needs to establish a more substantial justification for its

conduct. *Huntington Branch, NAACP,* 844 F.2d at 936. Plaintiffs in the present case merely seek to require the Town to permit them to continue to use housing which already exists. This is another factor which weighs heavily in plaintiffs' favor. Accordingly, because there is no genuine issue of material fact as to whether the Town's conduct actually or predictably has a discriminatory effect on plaintiffs due to their handicap, and the showing of discriminatory effect far outweighs defendant's justifications for its predisposition, plaintiffs' motion for partial summary judgment is granted.

D. *Plaintiffs' Claim that the Town Failed to Make Reasonable Accommodations Necessary to Permit Handicapped Persons to Use and Enjoy a Dwelling*

Even if the Town's proposed eviction of plaintiffs does not have a disparate impact on handicapped persons, the Court nevertheless finds that defendant's conduct constituted discrimination as it is defined in 42 U.S.C. § 3604(f)(3)(B). Under the FHA, it is a discriminatory practice to refuse to make "a reasonable accommodation in rules, policies, practices, or services when such accommodation may be necessary to afford [a handicapped] person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). Courts have unanimously applied the reasonable accommodations requirement to zoning ordinances and other land use regulations and practices. *See, e.g., Township of Cherry Hill,* 799 F.Supp. at 462-63; *Horizon House Developmental Services, Inc. v. Town of Upper Southampton,*804 F.Supp. 683, 699-70 (E.D.Pa.1992); *Stewart B. McKinney Foundation, Inc. v. Town Plan & Zoning Comm'n of the Town of Fairfield,*790 F.Supp. 1197, 1221 (D.Conn.1992); *United States v. Village of Marshall,*787 F.Supp. 872, 878 (W.D.Wis. 1991); *Oxford House-Evergreen v. City of Plainfield,*769 F.Supp. 1329, 1344-45 (D.N.J. 1991); *United States v. Commonwealth of Puerto Rico,*764 F.Supp. 220, 224 (D.P.R. 1991).

In the present case, plaintiffs requested that the Town modify the definition of a "family" as it was applied to them.[9] Plaintiffs have demonstrated that as recovering alcoholics and drug addicts, they must live in a residential neighborhood because an Oxford House "seeks to provide a stable, affordable, and drug-free living situation so as to increase the likelihood that a person will stay sober." (Plaintiffs' statement ¶ 6). In *Township of Cherry Hill,* the court held that the location of the houses in a drug-free, single family neighborhood played a crucial role in an individual's recovery by "promoting self-esteem, helping to create an incentive not to relapse, and avoiding the temptations that the presence of drug trafficking can create." *Township of Cherry Hill,* 799 F.Supp. at 450. This Court finds that reasoning persuasive. Because an Oxford House cannot exist in a single family, residential district under the Town Code, a modification of the definition of a "family" in plaintiffs' situation is warranted so that they may have the same opportunity to rent a house as do persons without handicaps.[10]

[ 819 F.Supp. 1186 ]

Plaintiffs have also established that the requested accommodation was reasonable. An accommodation is reasonable under the FHA if it does not cause any undue hardship or fiscal or administrative burdens on the municipality, or does not undermine the basic purpose that the zoning ordinance seeks to achieve. *Township of Cherry Hill,* 799 F.Supp. at 463-66; *Village of Marshall,* 787 F.Supp. at 878; *City of Plainfield,* 769 F.Supp. at 1344-45. Because one of the purposes of the reasonable accommodations provision is to address individual needs and respond to individual circumstances, courts have held that municipalities must change, waive, or make exceptions in their zoning rules to afford people with disabilities the same access to housing as those who are without disabilities. *Horizon House,* 804 F.Supp. at 699. *See also Township of Cherry Hill,* 799 F.Supp. at 461-63; *Village of Marshall,* 787 F.Supp. at 878; *Commonwealth of Puerto Rico,* 764 F.Supp. at 224.

As discussed above, the East Farmingdale Oxford House has no adverse effect on the residential character of the neighborhood that the Town Code seeks to preserve. Moreover, neither the operation of the house nor the residents themselves have caused any financial or administrative burdens on the Town. (Pitts Deposition, p. 37). Consequently, the Court finds that the requested accommodation was reasonable and defendant's failure to make such accommodation was discriminatory conduct.[11] Accordingly, even if the Court did not find that defendant's conduct had a disparate impact on plaintiffs, there is nevertheless no genuine issue of material fact with regard to defendant's violation of 42 U.S.C. § 3604(f)(3)(B), and plaintiffs' motion for partial summary judgment would be granted on this ground as well.

### III. CONCLUSION

Accordingly, for the foregoing reasons, plaintiffs' motion for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure is granted and defendant is

enjoined from taking any further steps to evict plaintiffs from the East Farmingdale Oxford House.

SO ORDERED.

## Footnotes

1. On the date that this suit was filed, co-plaintiffs Eugene T., Ernest S., Gary B., Robert R., and John R. were residents of the East Farmingdale house. Because they do not currently reside there, injunctive relief is not requested on their behalf.
Back to Reference

2. Section 213-1 of the Town Code defines a "single family dwelling" as "a building designated for and occupied exclusively as a home or residence for not more than one family."
Back to Reference

3. The Town of Babylon Multiple Dwelling Code § 153-13 states that a family is one or more persons related by blood, marriage, or adoption. It may also be a number of unrelated persons, *not exceeding four*, who are not related by blood, marriage or adoption. The East Farmingdale Oxford House accommodates from five to eight individuals.
Back to Reference

4. Although the Town asserted in Resolution No. 716 (Plaintiffs' exhibit B) that plaintiffs were not a "family" as defined by the Multiple Dwelling Code, in the action to evict, the Town alleges that plaintiffs are not a "family" or "functional and factual equivalent of a natural family" as defined by the Single Dwelling Code. Under § 213-1 of the Town's Single Family Code, a "family" is defined as "a single person or collection of persons related by kinship, adoption, blood or marriage...." The "functional and factual equivalent of a natural family" is defined in the same section as "a single housekeeping unit bearing the generic character of a family unit as a relatively permanent household, not a framework for transients or transient living...."
Back to Reference

5. Under a disparate impact analysis, the plaintiff need not show that the decision complained of was made with discriminatory intent. *Doe v. City of Butler, Pa.,*892 F.2d 315, 323 (3d Cir. 1989).
Back to Reference

6. Paul Molloy, a founder of Oxford House, attested that recovering alcoholics such as Oxford House residents "have discovered that, only by living with other recovering individuals, do the chances of staying drug and alcohol free increase greatly.... The supportive environment of an Oxford House gives the recovering individual in times of stress the opportunity to talk to other recovering persons who understand the day to day problems associated with recovery." (Declaration of Paul Molloy, ¶ 24). This testimony is unrefuted by defendants.
Back to Reference

7. Defendant relies on *Elliott v. City of Athens* for the proposition that in enacting the FHA, Congress intended "to advance the interests of the handicapped without interfering seriously with reasonable local zoning." *City of Athens,* 960 F.2d at 983. This Court finds *City of Athens* inapposite. In *City of Athens,* the Eleventh Circuit held that under 42 U.S.C. § 3607(b)(1) the city could impose reasonable restrictions on the maximum number of unrelated persons who may occupy a dwelling unit in an area zoned for single-family residences. Defendant has not and could not raise this claim because, unlike the ordinance at issue in *City of Athens,* the definition of a family in § 213-1 of the Town's Single Family Code does not contain any maximum limitations as to the number of related or unrelated persons who can occupy a single-family dwelling.
Back to Reference

8. One speaker exclaimed that an elderly neighbor with a bad heart would die of fright if one of the Oxford House residents broke into his house. (Town Board Meeting, p. 3).
Back to Reference

9. On or about September 6, 1991, Steven Polin, representing Oxford House, wrote to the Town attorney requesting that the Town make an accommodation in its zoning ordinance so as to permit plaintiffs to continue living in the House. (Affirmation of Paul Molloy, ¶ 17). The Town did not respond to this letter.
Back to Reference

10. Because the Town Code prohibits "rooming houses" or "boarding houses" in multifamily and single family districts, plaintiffs are not permitted to rent a house in any residential neighborhood in the Town. In any event, even if this were not the case, defendant would nevertheless be required to make an accommodation in its Code permitting plaintiffs to occupy *this* house. Title 42 U.S.C. § 3604(f)(3)(B) dictates that a handicapped individual must be allowed to enjoy a *particular* dwelling, not just some dwelling somewhere in the town. *City of Plainfield,* 769 F.Supp. at 1344.
Back to Reference

11. The Town asserts that because its zoning regulations do not have a harsher effect on one group than on another, it is not discriminating against plaintiffs. *See Doe v. Butler,* 892 F.2d at 323. The Court finds that defendant's reliance on *Butler* is misplaced. In that case, the plaintiffs challenged a local zoning ordinance as discriminating against them on the basis of their sex. The court held that because the ordinance had no greater impact on women than on men, there was no FHA violation. However, that case involved complaints

6/

greater impact on women than on men, there was no FHA violation. However, that case involved companies of inequitable treatment by groups who were entitled to be treated equally. Plaintiffs in the present case do not claim that they are entitled to be treated the same as other groups, but correctly assert that as handicapped persons they are entitled to *preferential* treatment under § 3604(f)(3)(B). *City of Athens*, 960 F.2d at 987 (Kravitch, J., dissenting).

Back to Reference

---

* BOELLNER v. CLINICAL STUDY CENTERS

* PATEL v. ABC UNIFIED SCHOOL DIST.

* TEXAS CO. OF MEXICO, S. A. v. ROOS

* IN RE UNITED PARCEL SERVICE WAGE AND HOUR CASES

* CAMMARATA v. BRIGHT IMPERIAL LIMITED

* EX PARTE NORTHWEST ALABAMA MENTAL HEALTH CENTER v. NORTHWEST ALABAMA MENTAL HEALTH CENTER ET AL.

* CHRISTIAN LEGAL SOCIETY CHAPTER OF UNIVERSITY OF CALIFORNIA v. WU

* LEE v. CITY OF COLUMBUS

* ANGELOTTI v. WALT DISNEY COMPANY

* CASTRO v. COLLECTO, INC.

* GOMES v. COUNTRYWIDE HOME LOANS, INC.

* ARTUSO v. VERTEX PHARMACEUTICALS, INC.

* IN THE MATTER OF UAL CORPORATION

* COMRIE v. IPSCO INCORPORATED

* U.S. v. CUEBAS

* U.S. v. CALVERT

* CIES BISKER, LLC v. 3M COMPANY

* U.S. v. WARDEN

* IN RE SKYLINE WOODS COUNTRY CLUB

* LIN v. METROPOLITAN LIFE INSURANCE COMPANY

Disclaimer    :::    Terms of Use    :::    Privacy Statement    :::    About Us    :::    Contact Us    :::    Copyright © 2010   Leagle,